[Crim. No. 13222. In Bank. June 18, 1970.]

In re HULEN T. HARRELL on Habeas Corpus.

[Crim. Nos. 13383, 13855. In Bank. June 18, 1970.]

In re MERVIN CARLOS McKINNEY on Habeas Corpus.

[Crim. No. 13888. In Bank. June 18, 1970.]

In re HOWARD NEU INGRAM, JR., on Habeas Corpus.

**COUNSEL**

Hulen T. Harrell, Mervin Carlos McKinney and Howard Neu Ingram, Jr., in pro. per., for Petitioners in Nos. 13222, 13383, 13855 and 13888.

James T. Fousekis, under appointment by the Supreme Court, for Petitioner in No. 13222.

Paul N. Halvonik and Charles C. Marson for Petitioner in No. 13888 and as Amici Curiae on behalf of Petitioner in No. 13222.

Thomas C. Lynch, Attorney General, Doris H. Maier and Albert W. Harris, Jr., Assistant Attorneys General, Nelson P. Kempsky and George R. Nock, Deputy Attorneys General, for Respondent.

---

**OPINION**

**SULLIVAN, J.**—Hulen T. Harrell, Melvin Carlos McKinney and Howard Neu Ingram, Jr., are prison inmates in the lawful custody of the Department of Corrections—Harrell and Ingram at San Quentin Prison and McKinney at Folsom Prison. By separate petitions for a writ of habeas corpus, prepared in propria persona, they complain of limitations placed by prison regulations and authorities upon their rights to give and receive mutual legal assistance, to have personal access to the courts, and to receive and have books and other printed materials. ■ "The writ of habeas corpus may be sought by one lawfully in custody for the purpose of vindicating rights to which he is entitled even in confinement. (*In re Riddle* (1962) 57 Cal.2d 848, 851 [22 Cal.Rptr. 472, 372 P.2d 304], and cases cited.)" (*In re Allison* (1967) 66 Cal.2d 282, 285 [57 Cal.Rptr. 593, 425 P.2d 193].) We issued individual orders to show cause and appointed separate counsel for each petitioner. Petitioner McKinney has discharged his appointed counsel and appears in propria persona. Since all three cases present common issues, we consider them together.[1]

*Mutual Legal Assistance*

Petitioners Harrell and McKinney complain of present limitations placed by prison regulations and authorities upon their efforts to provide legal assistance to other inmates. They claim that such present limitations are

---

[1] The two proceedings relating to petitioner McKinney (Crim. 13383 and Crim. 13855) were consolidated by order of this court.

contrary to the principles enunciated by the United States Supreme Court in *Johnson* v. *Avery* (1969) 393 U.S. 483 [21 L.Ed.2d 718, 89 S.Ct. 747]. Moreover, they contend that since discipline has been imposed upon them for the exercise of rights guaranteed by the *Johnson* decision, their records should be expunged of evidence of those disciplinary actions and the authorities should be ordered to ignore the same for future purposes of institutional classification and parole consideration.

We first consider the contentions made concerning certain present limitations upon mutual prisoner assistance. Our starting point for this purpose is the decision of the United States Supreme Court in *Johnson* v. *Avery*, *supra*, 393 U.S. 483.

In *Johnson* a Tennessee prisoner who had been disciplined for violation of a prison regulation prohibiting the rendering of legal assistance to other inmates sought relief by way of habeas corpus. The high court held that under the circumstances the effect of the regulation was to forbid illiterate or poorly educated prisoners to file habeas corpus petitions. It was pointed out that Tennessee did not provide any alternative means whereby such prisoners could gain access to the courts[2] and that therefore the expedient of mutual prisoner assistance was constitutionally necessary and could not be forbidden. It was emphasized, however, that although mutual prisoner assistance must be allowed in the absence of suitable alternatives, there could be reasonable regulation of the practice in light of institutional circumstances. "Even in the absence of such [alternative means of allowing illiterate and uneducated prisoners access to the courts], the State may impose reasonable restrictions and restraints upon the acknowledged propensity of prisoners to abuse both the giving and the seeking of assistance in the preparation of applications for relief: for example, by limitations on the time and location of such activities and the imposition of punishment for the giving or receipt of consideration in connection with such activities. Cf. *Hatfield* v. *Bailleaux,* 290 F.2d 632 (C.A. 9th Cir. 1961) (sustaining as reasonable regulations on the time and location of prisoner work on their own petitions.) But unless and until the State provides some reasonable alternative to assist inmates in the preparation of petitions for post-conviction relief, it may not validly enforce a regulation such as that here in issue, barring inmates from furnishing such assistance to other prisoners." (Fn. omitted.) (393 U.S. at p. 490 [21 L.Ed.2d at p. 724].)

At the date of the *Johnson* decision (February 24, 1969) the Rules of

---

[2]The court noted that alternative techniques had been developed in other states (state public defender systems, senior law student programs, volunteer bar association programs, designation of inmates as writ-writers) but expressed no opinion as to the constitutional adequacy of such plans. (393 U.S. at p. 489 [21 L.Ed.2d at p. 723].)

the Director of Corrections (hereafter Director's Rules) specifically forbade mutual legal assistance among prisoners. Director's Rule D 2602 then provided in relevant part: "No inmate shall assist or receive assistance from another in the preparation of legal documents. Any brief or petition not pertaining to his own case found in the possession of an inmate shall be confiscated." The imposition of discipline for violation of this rule was also provided for in the Director's Rules.

However, on March 19, 1969, less than a month after the *Johnson* decision was rendered, the Director's Rules were altered in an effort to conform to the constitutional requirements there enunciated. Inserted at the beginning of that portion of the rules which deal with legal documents was a statement of policy providing as follows: "It is the policy of the Department to allow inmates every legal access to the courts. The Department, however, is neither equipped nor authorized to assist inmates in their legal efforts except to provide staff assistance to inmates, who are illiterate or otherwise physically incapable, in the preparation of forms adopted under rules of the United States Courts and by the Judicial Council of California for petitions for Habeas Corpus or Modification of Custody. There will be a suitable place in each institution where inmates, with the permission of the designated employee, may have access to study such institution law books as are available to them. Law books are defined to include constitutions, codes, court reports, texts, and dictionaries."

At the same time Director's Rule D 2602 was wholly revised. It now provides: "One inmate may assist another inmate in the preparation of legal documents, but may not receive remuneration therefor. Remuneration is not limited to present benefits, but includes future as well as past benefits. A room or rooms may be designated by the Warden or Superintendent for this purpose. *All briefs, petitions and other legal papers must be and remain in the possession of the inmate to whom they pertain.*" (Italics added.)

 A major question before us in this case is whether these amendments to the Director's Rules, and particularly the revised version of Rule D 2602, contain limitations upon the right of mutual assistance which are inconsistent with the principles enunciated in *Johnson* v. *Avery.*[3]

It is clear at the outset that the March 19, 1969, amendments to the

---

[3] We believe that petitioners have standing to raise this question, and that the issue is now properly before us, in spite of the fact that none of the petitioners is presently under a disciplinary sentence for violation of Rule D 2602. For reasons which will be made clear below we do not require that an inmate, in order to challenge the constitutionality of a rule applicable to his confinement, must first violate that rule and suffer disciplinary action.

Director's Rules reflect a sincere effort to provide for the legal assistance of less literate inmates in a way which both complies with the *Johnson* decision and is consistent with the realities of prison life. Thus, the statement of policy which now precedes the body of rules dealing with inmate legal work indicates that staff assistance will be provided to illiterate inmates and others who are "physically incapable" of preparing their own petitions.[4] More significantly from the standpoint of *Johnson,* the amended version of Rule D 2602 expressly provides for the assistance of such inmates by other inmates and contemplates that space will be made available to facilitate consultation. The rule's prohibition against remuneration, of course, is expressly sanctioned by *Johnson.* (393 U.S. at p. 490 [21 L.Ed.2d 724].)

A difficult problem is presented, however, by the fact that Rule D 2602 continues to prohibit the possession of legal papers belonging to another inmate. Petitioners, on the one hand, argue that this prohibition violates the principles of *Johnson* because it has the effect of preventing any meaningful legal assistance of one prisoner by another. Such assistance can be provided, it is urged, only if the advising inmate can have more or less extended access to the papers pertaining to the case in order to permit the legal research and drafting necessary to the preparation of a petition.

The Director, on the other hand, points out that the possession of one inmate's papers by another inmate can lead to undesirable consequences in the atmosphere of a custodial institution. Apparently experience has shown that a prisoner possessing the legal papers of another may through inadvertence or design allow such papers to become damaged or lost— and that such a situation can lead to ill feelings which may result in violence. Moreover, it appears that some inmates engage in the practice of withholding the legal papers of another inmate in order to enforce some kind of remuneration for legal services. In any event, it is clear that the possession of one inmate's legal papers by another gives the latter a leverage to achieve that kind of dominance over the former which some "writ-writers" have been known to enjoy. (See *Hatfield* v. *Bailleaux* (9th Cir. 1961) 290 F.2d 632.) In view of these considerations the Director maintains that the proscription against possessing legal papers of other inmates is a reasonable restriction "upon the acknowledged propensity of

---

[4] It is unclear whether this statement contemplates that other than clerical assistance will be provided. In any event, it is apparent that the assistance of inmates by employees is not permitted absent high level authorization. Director's Rule D 5218 provides: "Employees shall not assist in the preparation of a petition for executive clemency or in the preparation of writs unless specifically directed to do so by the institution or division head."

prisoners to abuse both the giving and seeking of assistance in the preparation of applications for relief . . . ." (393 U.S. at p. 490 [21 L.Ed.2d at p. 724]) and is therefore among those restrictions permitted by *Johnson*.

The problem highlighted by these competing considerations is inherent in every prison rule which, for legitimate institutional reasons, has the effect of limiting mutual prisoner assistance. Although the *Johnson* decision does not offer a precise solution for the problem, it does define the area in which such a solution is to be found. ■ Thus, on the one hand *Johnson* establishes that, absent any suitable alternative means for providing legal assistance to illiterate and uneducated prisoners, there may be no prison rule which has the effect of *preventing* mutual prisoner assistance. On the other hand, however, *Johnson* concludes that prison rules which do not *prevent,* but merely restrict in a reasonable manner, prisoner assistance do not offend the Constitution. The question remains whether a given restriction is proper.

We have concluded that the proper determination of this question in a particular case requires that we measure the *extent* of restriction against the *need* for restriction. The following inquiries are relevant to this determination: (1) To what extent does the application of the particular rule have the actual effect of impeding or discouraging mutual prisoner assistance? (2) From the standpoint of legitimate custodial objectives, how undesirable is the conduct sought to be avoided by the particular rule? (3) Are there reasonable alternative means of dealing with the undesirable conduct which do not entail so significant a restriction upon mutual prisoner assistance? ■ When these factual questions have been answered we then must proceed to determine whether the extent of limitation is justified in light of the gravity of the undesirable conduct sought to be avoided and the availability of other measures for dealing with this conduct. If the application of the rule impedes or discourages mutual prisoner assistance to a significant degree, the burden of justification will be great. If, on the other hand, the application of the rule results in mere inconvenience to prisoners seeking legal assistance and there is a clear institutional reason for the restriction, the rule must be sustained.[5]

■ We think it manifest that the particular rule here in question,

---

[5]It should be emphasized that it is the needs of the prisoner *seeking* assistance which the constitutional principles enunciated in *Johnson* are designed to protect—not the asserted "needs" of those inmates who are disposed to give assistance. A rule which impedes or discourages mutual prisoner assistance is one which tends to prevent illiterate or uneducated prisoners from receiving legal assistance—*not* necessarily one which restricts the ability of a particular prison "lawyer" to function. "[I]t is really the prisoner client's rights, not the jailhouse lawyer's, which are most in need of protection." (*Johnson* v. *Avery, supra,* 393 U.S. 483, 501 [21 L.Ed.2d 718, 730] (dissenting opinion).)

which prohibits one inmate from possessing the legal papers of another, has a severe effect upon the ability of an illiterate or uneducated prisoner to gain assistance from a more gifted one. Even assuming the existence of extensive opportunity for prisoners to "consult" one another on legal matters,[6] the fact remains that in most cases the kind of assistance which is sought by the less gifted inmate is the actual *drafting* of an application for relief by the other. Clearly one cannot very well draft an application for relief without possessing at least one legal paper "pertaining" to another, namely, the very application itself. Moreover, reference to other papers—such as transcripts and prior applications for relief—is a practical necessity. The rule, as we read it, would require that all such drafting take place in the physical presence of the inmate seeking to be aided so that he can retain "possession" of legal papers "pertaining" to him. This, we think, is wholly impractical and adverse to the purpose to be served by permitting mutual assistance.

Our conclusion that the rule in question impedes or discourages mutual prisoner assistance to a significant degree does not, as we have explained, require that the rule be invalidated. It does, however, place the burden of justification upon the Director. We have reviewed above the abuses which the rule was designed to avoid, that is, the withholding of legal papers to enforce remuneration or achieve other illicit objectives, and the avoidance of situations conducive to violence. Clearly these are substantial concerns and custodial officials must not be prevented from taking effective action against such conduct. It does not appear, however, that the only means of attaining this objective must entail the severe restriction upon mutual prisoner assistance which the questioned rule involves. *Johnson* itself contemplates that punishment may be imposed for the giving or taking of remuneration in connection with writ-writing activities, and there is no doubt that the withholding of legal papers for purposes of extortion may also be severely punished. Similarly, an inmate who destroys or damages the legal papers of another may be dealt with directly.

Just as in *Johnson* it was concluded that the prohibition of mutual prisoner assistance could not be justified on the basis of deleterious consequences such as remuneration which were capable of direct control, so in

---

[6]Respondent states that "inmates in the general population of San Quentin and the other state institutions are permitted to mingle with each other on a relatively unrestricted basis. There are several hours during each day when a prisoner who seeks assistance from another inmate may take his papers to that inmate for examination and discussion. So long as the inmate to whom the papers belong remains in control of the papers, prison officials place no restrictions upon consultation other than those required by the usual regulations regarding meals, lock-up, etc." Although respondent does not specifically so state, there appears to be no prohibition against an advising inmate taking notes concerning the case of the inmate who is being aided.

the instant case we conclude that the prohibition against possession of another's legal papers, which results in a severe restriction upon such assistance, is not justified by the possibility of abuses which can be dealt with by other effective means. We therefore hold that that portion of Rule D 2602 which provides "All briefs, petitions and other legal papers must be and remain in the possession of the inmate to whom they pertain" constitutes an unreasonable restriction upon the right of access to the courts and is invalid.

Petitioner McKinney also challenges several other restrictions which, he asserts, have a similarly extreme effect upon the right of access to the courts. In essence his contention is that the restrictions cited have prevented him from operating effectively as legal counsel for the many inmates in several penal institutions whom he assists and purports to "represent." Thus, he complains that he has been prevented from filing legal documents on behalf of such "client" inmates; that he has been prevented from corresponding with inmates confined at institutions other than that in which he himself is confined; that he has not been allowed to interview an inmate confined in isolation; and that he has been denied access to the disciplinary records of prisoners whom he is assisting. Moreover, McKinney inveighs against the actions of prison officials which, in accordance with regulations applicable at Folsom Prison, have prevented him from possessing a library of personally owned law books in his cell.

We first place these complaints in the context required by the principles enunciated in *Johnson* v. *Avery*.[7] As we have suggested above (see fn. 5, *ante*), it is the rights of illiterate and uneducated prisoners which are protected by *Johnson*—not the assumed prerogatives of those inmates who have, for one reason or another, set themselves up as legal consultants. Only when, as in *Johnson* itself, a prison regulation or restriction affecting those who offer legal assistance has the additional effect of preventing or tending to prevent disadvantaged inmates from receiving aid in the preparation of applications for relief can it be said that that regulation or restriction effectively impedes or discourages mutual prisoner assistance within the meaning of *Johnson*. Moreover, it must be emphasized that *Johnson* contemplates the giving of *assistance* by one inmate to another—not the legal *representation* of one inmate by another. Thus, any prison restriction which forbids representation rather than assistance involves no conflict with *Johnson*.

 With these principles in mind we turn to the first of petitioner

---

[7] The last complaint set forth—that concerning the possession of personal law books —will also be considered *infra* in connection with other contentions concerning the interpretation and application of section 2600 of the Penal Code.

McKinney's specific complaints—i.e., that prison authorities have prevented him from filing an application for relief on behalf of another prisoner. ▮ In general an application for relief, although it may be prepared by another, should be signed, verified, and filed by the inmate or inmates seeking relief. ▮ As we have indicated, the principle of *Johnson* seeks to insure that a disadvantaged prisoner will receive aid in his personal efforts to apply to the courts for relief—not that such a prisoner will be represented by another inmate before the courts—and the courts will, generally speaking, refuse to entertain an application made by a prisoner other than him for whom relief is sought. ▮▮ Only in very exceptional circumstances will a "next friend" application (see Pen. Code, § 1474) be entertained.[8] "[T]he complaint must set forth some reason or explanation satisfactory to the court showing why the detained person does not sign and verify the complaint and who 'the next friend' is. It was not intended that the writ of habeas corpus should be availed of, as a matter of course, by intruders or uninvited meddlers, styling themselves next friends. *Gusman* v. *Marrero,* 180 U.S. 81, 21 Sup. Ct. 293, 45 L.Ed. 436." (*United States* ex rel. *Bryant* v. *Houston* (2d Cir. 1921) 273 F. 915, 916; see *Wilson* v. *Dixon* (9th Cir. 1958) 256 F.2d 536, 537-538.)[9]

▮ It should be emphasized, however, that these limitations do not imply a right on the part of prison authorities to determine when an application for relief is or is not properly filed. As the United States Supreme Court has stated with regard to such applications within the federal court system, "Whether a petition for writ of habeas corpus addressed to a federal court is properly drawn and what allegations it must contain are questions for that court alone to determine." (*Ex Parte Hull* (1941) 312 U.S. 546, 549 [85 L.Ed. 1034, 1036, 61 S.Ct. 640].) Similarly, we think

---

[8]While we intimate no opinion as to the circumstances which may be deemed sufficiently exceptional to warrant a "next friend" petition, we would expect that such circumstances might arise in the context of a prisoner in isolation seeking judicial relief from such restricted confinement. Although the Director's Rules contemplate that those in isolation may prepare and file applications for relief, as well as correspond with an attorney (Rule D 2606), there may be instances in which the protection of such a prisoner's right of access to the courts requires other modes of legal assistance such as the filing of a "next friend" petition by another inmate.

[9]In the instant proceeding petitioner McKinney has attempted to raise the merits of applications for relief which he has purported to file on behalf of other inmates. He may not do so for two reasons. First, the orders to show cause in Crim. 13383 and Crim. 13855 were issued in order to explore the implications of *Johnson* v. *Avery* concerning the validity of prison regulations affecting mutual prisoner assistance, and the matters sought to be raised on behalf of other prisoners are not related to this inquiry. Second, because the matters sought to be raised do not affect petitioner personally and he has not stated "exceptional circumstances" which would justify our consideration of such matters by means of a "next friend" petition, we do not address ourselves to their merits. The affected inmates may file their own applications for relief.

that a state court to which an application for relief is directed has the exclusive power to determine whether that application is properly filed or states legal grounds for relief. Prison authorities may not refuse to forward a document addressed to a court on the ground that it is improperly filed.

As for petitioner McKinney's complaint concerning the refusal of prison authorities to allow him to correspond with inmates at other institutions, it is clear that the restriction in question has no significant effect upon the rights guaranteed in *Johnson*. Again, it is the rights of the prisoner needing, rather than those of the prisoner giving, legal assistance which concerns us.[10] *Johnson* certainly offers no support for the proposition that illiterate and uneducated inmates have a constitutional right to the assistance of *a particular inmate* in the preparation of applications for relief; rather the right there enunciated is the right *to be assisted*. No infringement upon that right necessarily results from restrictions upon the activities of a particular inmate "lawyer." Thus, those inmates at institutions other than Folsom who are prevented from corresponding with petitioner McKinney by valid regulations limiting the number and identity of correspondents may seek legal assistance from inmates at their own institutions.

Similarly, restrictions upon the number of books which an inmate may have in his cell[11] impinge upon the rights enunciated in *Johnson* only to the extent it is shown that the ability of other inmates seeking legal assistance to gain such assistance is affected. Unless and until it is demonstrated that other sources of legal assistance—e.g., other inmates who use the prison library—cannot provide assistance to disadvantaged inmates, the state of any inmate's personal library is of no significance.

Petitioner McKinney's contention that he must be allowed to interview inmates in isolation is without merit. Granting that the status of isolation—which by its very nature forbids contact with other inmates—results in a significant curtailment of the extent to which the affected prisoner may avail himself of assistance by other prisoners,[12] we believe that such cur-

---

[10]Petitioner McKinney's contention that a restriction upon one who gives legal assistance necessarily implies a like restriction on the receipt of such assistance by others is a plain non sequitur.

[11]Director's Rule D 2601 provides in relevant part: "Personally-owned law books shall be limited by local regulations to the availability of space for personal property in the inmate's quarters. Law books in excess of this limitation may be donated to the library, sent home or destroyed, whichever the inmate prefers." Regulations applicable at Folsom provide that prisoners in the general population may have no more than 16 hard-cover books at any one time.

[12]We do not consider that confinement in isolation wholly prevents an inmate from receiving the benefits of legal assistance by other prisoners. A prisoner who has been given access to the papers of an inmate subsequently placed in isolation may continue

tailment is justified by valid institutional considerations. Isolation is the extreme institutional sanction that is available to prison authorities for disciplinary purposes, and its importance in this regard warrants the limitations on prisoner legal assistance which are necessarily imposed thereby.[13]

Finally, we reject petitioner McKinney's contention that the principles of *Johnson* require that he be provided with prison disciplinary records concerning inmates to whom he is rendering legal assistance. Such records are not relevant to applications for relief from an invalid judgment of conviction. As for applications sought to vindicate rights in confinement (see *In re Riddle* (1962) 57 Cal.2d 848, 851 [22 Cal.Rptr. 472, 372 P.2d 304]), relevant disciplinary reports will be brought before the court if the facts stated in the application are deemed sufficient to justify the issuance of an order to show cause. The institutional interest in having confidential disciplinary files is significant and warrants the restriction in question.

For the reasons stated we have concluded that the March 19, 1969, revision of Director's Rule D 2602, while in the main consistent with the principles enunciated in *Johnson* v. *Avery, supra*, 393 U.S. 488 [21 L.Ed.2d 723], is violative of those principles and therefore invalid insofar as it requires that "All briefs, petitions and other legal papers must be and remain in the possession of the inmate to whom they pertain." We have also examined several other present restrictions and limitations urged to be violative of *Johnson*. We now proceed to consider the contention concerning past disciplinary action taken by prison authorities on account of conduct which, in light of *Johnson* and the instant case, was consistent with the right of mutual prisoner assistance.

---

to prepare an application in that inmate's behalf during the period of isolation. In cases wherein the filing of an application during the period of isolation is thought necessary—e.g., where the legality of the imposition of isolation itself is sought to be challenged—a "next friend" application may be filed by an assisting inmate. As we have indicated, however, such a petition will not be considered on its merits in the absence of a strong showing of necessity.

[13]As we have indicated above (fn. 8, *ante*), the Director's Rules permit an inmate in isolation to prepare and file his own legal documents and correspond with an attorney. This rule, we believe, should be applied also to permit an inmate to correspond with another inmate in this institution for the purpose of preparing an application for relief. We presume that illiterate prisoners in isolation are provided with the clerical assistance necessary to their preparation of an application for relief or a letter to an attorney or assisting inmate.

It should also be noted that the normal maximum term of confinement in isolation is 30 days, and that a longer term may be imposed only with the approval of the Director himself. (Director's Rule D 4511.)

▮ It is urged that an inmate's disciplinary record should be purged of any reference to past infractions of rules—notably of the rule forbidding the possession of legal papers belonging to another inmate—which have been held invalid under the principles enunciated in *Johnson*. It is also urged that custodial and parole authorities should be instructed to disregard infractions in their future actions and deliberations. We do not agree.

Assuming that disciplinary sentences for violations of rules contrary to *Johnson* have been served, the sole effects of entries in prison records reflecting such violations would be (1) their possible use in determining appropriate custodial classification and institutional placement, and (2) their possible use in deliberations of the Adult Authority. We do not believe that any beneficial purpose would be served by ordering that the public authorities concerned in each of these areas remove from their consideration all past rule infractions of the type here in question. Even upon the extravagantly optimistic assumption that it would be possible to determine whether any given past infraction actually involved conduct protected by *Johnson,* and putting to one side the vast administrative effort which even an attempt at that determination would entail,[14] it is apparent that little practical benefit would result in view of the considerable discretionary powers of the subject authorities. (See *In re Schoengarth* (1967) 66 Cal.2d 295, 300 [57 Cal.Rptr. 600, 425 P.2d 200].) Moreover, although we believe that *future* consideration by custodial and parole authorities of *past* infractions should proceed in light of the *Johnson* decision, we are also of the view that authorities concerned with the assessment of conduct in the context of rehabilitation should not be required to wholly disregard conduct which manifests a disinclination to be governed by legal authority. The fact that such conduct might be later declared to be a valid exercise of

---

[14]An example of the problems that might arise is provided by one incident complained of by petitioner Harrell. On March 10, 1969, the prison "security squad" undertook a routine search of Harrell's cell and discovered therein a typewriter, various law books, and certain legal papers. These items were seized as contraband possessed in violation of Director's Rule D 1205, which provides in relevant part that "Anything not issued to you, sold to you through the Canteen, permitted by the rules, specifically authorized, or any property of another, or anything which is being misused is contraband and will be confiscated." The disciplinary report subsequently filed indicated that the typewriter was "contraband" because it was not listed in prison records among the prisoner's property; that the law books were "contraband" because they were overdue or were not checked out from the prison library; and that the legal papers were "contraband" because they were the property of three other inmates and were possessed in violation of Rule D 2602. After a hearing petitioner Harrell was found guilty of possessing "contraband" in violation of Rule D 1205 and was sentenced to isolation.

Certainly if mention of the violation of Rule D 2602 were deleted from the disciplinary report here in question the basic Rule D 1205 violation would be unaffected. It is difficult to understand how such deletion would benefit anyone.

constitutional rights, while not to be excluded from consideration, does not operate to render the infraction an irrelevancy.

Although the constitutional rights of persons committed to prison must be accorded the same zealous protection that all constitutional rights enjoy, that axiom cannot be allowed to obscure the fundamental distinction between free citizens and those who have been subjected to imprisonment as a result of legal processes. ██ Whereas the dynamics of a free society may accommodate challenge to invalid rules by violation thereof and subsequent judicial vindication, (see *In re Berry* (1968) 68 Cal.2d 137, 148-149 [65 Cal.Rptr. 273, 436 P.2d 273], and cases there cited), the purposes and functions of penal institutions—fundamental among which is the rehabilitation of prisoners through rendering them amenable to governance by rules—cannot permit the existence of such procedures. ██ If we were to hold, as urged, that past infractions of prison rules found to be unconstitutional under present standards must be disregarded by prison and parole authorities, we would thereby encourage the flouting of rules thought to be constitutionally defective by individual inmates and severely impair the rehabilitative capabilities of penal institutions. This we decline to do.

We do not suggest that future disregard of the principles set forth in *Johnson* v. *Avery* and the cases filed here today will be insulated from judicial redress in all cases except those in which invalid disciplinary sentences are outstanding at the time of the application for relief. Indeed, if it should be made to appear that such disregard is occurring this court has ample power to prevent its continuance. We hold only that discipline imposed for past violations of rules subsequently held to be in violation of the principles announced in *Johnson* v. *Avery* will not be withheld from the future consideration of custodial and parole authorities.

*Personal Access to the Courts*

██ ██ Petitioner Harrell contends that his right of access to the courts has been unreasonably restricted by the application to him of certain regulations governing the use of the prison library. Thus, he points out that at various times he has been limited to one visit per week to the prison libarary, that he has been disciplined for talking with other inmates while in the legal section of the library, and that he has experienced difficulty in obtaining books which he has ordered from the state library.[15]

Prison records attached as exhibits to the return to the order to show

---

[15]Current San Quentin library regulations contemplate that inmates may order books which are not available in the prison library. Orders for such books are sent out once a week to the state library.

cause reveal that petitioner has indeed been disciplined on numerous occasions for persistent infractions of rules relating to use of the prison library. Among the activities for which such discipline has been imposed are: use of the library more frequently than regulations permit;[16] loud, boisterous, and defiant conduct while in the library causing disturbance and agitation of other inmates;[17] failure to return overdue books;[18] and an attempt to check out books when his privilege card had been suspended because of prior infractions.[19]

In *In re Allison, supra,* 66 Cal.2d 282 and *In re Schoengarth, supra,* 66 Cal.2d 295, we held that prison rules promulgated pursuant to constitutional and statutory authority (see Cal. Const., art. X, § 1; Pen. Code, §§ 5054, 5058) may properly regulate the use of prison legal facilities by inmates in a manner which does not unreasonably impede access to the courts by such inmates. The rules involved in this case whose application has allegedly impaired petitioner Harrell's access to the courts are manifestly reasonable. Moreover, "they are responsive to the practical limitations of space, materials, and staff available, and to the necessity of maintaining control over a large number of prisoners confined within narrow bounds." ( *In re Allison, supra,* 66 Cal.2d 282, 291.) It does not appear that such rules have been applied to petitioner Harrell in a discriminatory manner or with a view to silencing his voice in the courts; rather, it appears that sanctions and limitations have been visited upon petitioner Harrell only because of his apparently adamant refusal to abide by reasonable regulations for the library applicable to the entire prison population. His access to the courts has not been unreasonably impeded.

Petitioners McKinney and Harrell contend that their right of access to the courts has been unreasonably restricted because the legal materials contained in the prison libraries at their respective institutions (Folsom and San Quentin) are inadequate to permit effective research.

---

[16]Current regulations for use of the San Quentin library provide in relevant part: "3. Come to the library ONCE A WEEK ONLY, at your scheduled time; this applies to the use of legal books also. The week begins on Sunday. . . . 14. At maximum capacity, we can only accommodate 50 men at one time; after this amount the rule is "ONE MAN IN, AND ONE MAN OUT!!"
Prison records reveal that during the period from July to November 1968 petitioner visited the library on 91 occasions.

[17]Current San Quentin library regulations provide in relevant part: "15. It is necessary to maintain a proper attitude and atmosphere for studying; therefore, all loud and boisterous talking, horseplay, cannot be tolerated in the library."

[18]Current San Quentin library regulations provide in relevant part: "4. You may draw (5) books a week, and keep them for two weeks if necessary."
One disciplinary report concerning petitioner relates that on August 23, 1968, a routine cell search disclosed 55 overdue library books in petitioner's cell.

[19]Current San Quentin library regulations provide that a privilege card is required to check out books from the library.

Several decisions of this court, as well as one frequently cited decision of the United States Court of Appeals for the Ninth Circuit, have indicated in positive terms that inmates in the state prison system have no legally enforceable rights to engage in legal research except insofar as such research is necessary to insure access to the courts. (*In re Schoengarth, supra,* 66 Cal.2d 295, 305; *In re Allison, supra,* 66 Cal.2d 282, 289-290; *In re Ferguson* (1961) 55 Cal.2d 663, 677, fn. 1 [12 Cal.Rptr. 753, 361 P.2d 417]; *In re Chessman* (1955) 44 Cal.2d 1, 10 [279 P.2d 24]; *Hatfield v. Bailleaux, supra,* 290 F.2d 632, 640-641.) That standard, which conceptually begs the question asked of it, has nevertheless been applied to sustain former Director's Rule D 2602 forbidding mutual prisoner assistance (*Schoengarth*) and has operated to repel constitutional attack against various regulations effectively limiting prisoner access to legal materials (*Allison; Hatfield*).

We cannot fail to recognize, however, that the decision of the United States Supreme Court in *Johnson* v. *Avery* heralds the advent of new principles governing the question of prisoner access to legal materials. Our recognition of this fact is concretized in preceding pages of this opinion wherein we have attempted to develop a flexible standard governing restrictions upon the right of mutual prisoner assistance. Moreover, we are cognizant that the principles of *Johnson* may, in a proper case, require a judicial assessment of the adequacy of prison libraries to permit legal research of a certain minimum degree of effectiveness. This court has itself recognized that some kind of access to legal materials is necessary to the preparation of any effective application for relief. "[A]lthough [an application] should ordinarily be predicated on a full and honest statement of the *facts* which the inmate believes give rise to a remedy (*In re Chessman* (1955) 44 Cal.2d 1, 10 [279 P.2d 24]; *In re Swain* (1949) 34 Cal.2d 300, 302, 304 [209 P.2d 793]), the relevance of certain facts may not be apparent to him until he has done some legal research on the point." ( *In re Schoengarth, supra,* 66 Cal.2d 295, 305.)

We do not believe, however, that the records in the proceedings before us raise and expose the issue to the extent necessary for us to reach it. Petitioners are content to allege that the libraries at their institutions are insufficient to their needs; they make no effort to indicate the deficiencies which are the basis of their claim of constitutional insufficiency. Nothing has been presented as to the actual contents of the libraries in question. In these circumstances we think it wise to defer decision on the issue sought to be raised until a fuller record is before us.[20]

---

[20]We note that very recently a three-judge panel of the United States District Court for the Northern District of California—apparently with the benefit of a record more adequate to the task than that now before us—addressed itself to the problem of con-

*Right to Purchase and Receive Reading Materials*

Petitioners Ingram and McKinney complain of various restrictions that have been placed upon their right to purchase and receive reading materials pursuant to section 2600 of the Penal Code.[21]

We summarize the complaints of petitioners relative to restrictions which they claim are inconsistent with their rights under section 2600. (1) Petitioner McKinney complains of an institution rule at Folsom Prison which limits him to 16 hard-bound books in his cell at any one time and effectively prevents him from having sets of law books purchased by him. (2) Petitioner Ingram complains of an institution order at San Quentin which requires that books and other literature be purchased from a vendor approved by the institution. (3) Petitioner Ingram complains of an institution order purporting to implement that portion of section 2600 which allows the institution to forbid receipt by inmates of published materials falling within certain subject-matter categories.[22]

---

stitutional sufficiency of state prison libraries and issued an order granting relief to the prisoner plaintiffs. Specifically, the defendant state authorities were enjoined from enforcing a present regulation of the Department of Corrections specifying the contents of prison libraries and were ordered to file on or before September 1 new or amended regulations in accord with the principles announced by the court in its opinion—the court to render "such further decision as it deems appropriate" on the basis of such proposed regulations and further argument concerning the same. (*Gilmore* v. *Lynch* (N.D. Cal. 1970, No. 45878) 319 F.Supp. 105.) In addition to the reasons which we have above stated, we think it appropriate at this time to refrain from considering the issue in question until the federal proceedings in *Gilmore* are completed.

[21]Section 2600, as amended in 1968, provides in relevant part: "This section shall be construed so as not to deprive [a person sentenced to imprisonment] of the following civil rights, in accordance with the laws of this state: . . . (4) To purchase, receive, and read any and all newspapers, periodicals, and books accepted for distribution by the United States Post Office. Pursuant to the provisions of this section, prison authorities shall have the authority to exclude obscene publications or writings, and mail containing information concerning where, how, or from whom such matter may be obtained; and any matter of a character tending to incite murder, arson, riot, violent racism, or any other form of violence; and any matter concerning gambling or a lottery. Nothing in this section shall be construed as limiting the right of prison authorities (i) to open and inspect any and all packages received by an inmate and (ii) to establish reasonable restrictions as to the number of newspapers, magazines, and books that an inmate may have in his cell or elsewhere in the prison at one time."

[22]Other contentions made by petitioners have apparently been rendered moot by recent changes in institutional rules and policies. Petitioner Ingram complained of that portion of San Quentin Institutional Order No. 408 which required that an inmate have 90 days of "clear conduct" (i.e., without disciplinary infractions resulting in "loss of privilege status") before he could order or purchase items such as books not available at the prison canteen. The order has been revised so that this restriction "does not apply to purchase of books, legal opinions, and/or magazine subscriptions," and we are assured by the Attorney General that the restriction is also not presently applied to newspaper subscriptions. Petitioners Ingram and McKinney also complained of institutional rules which forbade inmates from receiving clippings or excerpts from magazines, newspapers, or other periodicals. The subject rule at San

■ We turn first to the matter raised by petitioner McKinney. It appears that in September of 1969 petitioner McKinney requested and obtained permission to receive a number of legal publications which included "Lawyer's Edition Supreme Court Reporter 2d" and "Supreme Court Digest." Petitioner proceeded to make arrangements to purchase these items through approved correspondents, but prior to delivery prison authorities revoked the authorization. As the associate warden explained in a letter to petitioner's mother, prison authorities were unaware at the time of authorization that the material in question consisted of 42 volumes, and as soon as they were made aware of that fact the authorization was withdrawn because possession of 42 hard-bound books would be in violation of prison rules.[23] The letter further explained to the mother that the two sets in question would be sent to her and that petitioner "may request through my office a varying number of the volumes (so as not to exceed the 16-book limit) as he may need same."

It is clear, of course, that a limitation of the type here in question is expressly contemplated by Penal Code section 2600. ("Nothing in this section shall be construed as limiting the right of prison authorities . . . (ii) to establish reasonable restrictions as to the number of newspapers, magazines, and books that the inmate may have in his cell or elsewhere in the prison at one time.") Moreover, we are of the view that the restriction placed by Folsom Warden's Rule F 2402 and Director's Rule D 2601 is reasonable in light of applicable custodial circumstances. The prison authorities have indicated a willingness to allow petitioner to use his personal "library" within the limits of the 16-book rule by means of mail requests to his mother. If petitioner wishes to have more convenient access to the whole of his "library" he may do so within the terms of Director's Rule D 2601 by donating it to the prison library.

■ We next consider the matter of approved vendors. San Quentin Institution Order No. 408 provides in substance that, whereas certain items not available at the prison canteen may be received from approved correspondents (typewriters, drafting equipment, musical instruments and

---

Quentin, whose purpose was preventing "pin-up" collections, has been suspended following a determination that such collections can be more effectively controlled by restrictions upon the *content* of clippings and excerpts. If such a rule continues to exist at Folsom it should not be applied to prevent inmates from receiving copies of published judicial opinions from approved correspondents—as petitioner McKinney alleges it has been applied in the past.

[23]Director's Rule D 2601 provides in relevant part: "Personally-owned law books shall be limited by local regulations to the availability of space for personal property in the inmate's quarters. Law books in excess of this limitation may be donated to the library, sent home or destroyed, whichever the inmate prefers." Folsom Warden's Rule F 2402 provides that an inmate may possess no more than 16 personal hardbound books at one time. San Quentin Institution Order No. 408 provides that an inmate may possess no more than 10 hard-bound and 20 paperback books.

equipment, and hobby tools), books may be received only from "Cottage Book Store [San Rafael] . . . or other suitable vendors." Petitioner Ingram contends that this restriction is unreasonable and irrational—and that it is not authorized by Penal Code section 2600. It is urged that the institutional rationale for the rule—to wit, the prevention of smuggled contraband —is much more applicable to items such as musical instruments than it is to books because the former would provide a more convenient vehicle for smuggling contraband.

The Director, however, points out a tenable basis for the distinction. The number of items such as typewriters and musical instruments which are sent to the inmates is relatively small, so that authorities have the time to make a thorough search of them before delivery to the inmate. On the other hand, the volume of printed material coming to the inmates is great, and the institution is not adequately staffed to permit minute inspection of all of this material. Thus it has been determined that the best way of preventing the smuggling of contraband in books and other printed material is to control the source from which it is sent. Newspapers and magazines must come directly from the publisher. (Director's Rule D 2402, subd. 12.) Books must come from vendors who can be counted upon to refrain from cooperating in schemes for smuggling contraband.

We believe that this arrangement, although not expressly sanctioned by Penal Code section 2600, is reasonable and proper. ▮ Section 2600 cannot be construed as a straitjacket limiting the ability of prison authorities to deal with institutional realities. Rather it is to be viewed as a prison "bill of rights" setting forth certain fundamental guarantees which are to be protected against arbitrary infringement. ▮▮ The guarantee which here concerns us—that of receiving and reading "any and all" printed matter other than that in prohibited subject-matter categories—is not automatically infringed by a requirement as to the source from which that material must come. Only if it should be made to appear that certain nonprohibited reading matter cannot be obtained from authorized sources would an infringement of the basic guarantee be involved. No such showing has been made in the instant case.

▮ Finally, we treat petitioner Ingram's contention that prison authorities have undertaken "censorship" of printed materials beyond that authorized by section 2600.

The relevant portion of section 2600 provides that "prison authorities shall have the authority to exclude obscene publications or writings, and mail containing information concerning where, how, or from whom such matter may be obtained; and any matter of a character tending to incite murder, arson, riot, violent racism, or any other form of violence; and any matter concerning gambling or a lottery."

San Quentin Institution Order No. 507 was revised following enactment

of the above portion of section 2600 in order to conform with the statutory mandate. The latest revision of that order, effective March 10, 1970, is set forth in full in the margin.[24] It provides inter alia that periodical[25] pub-

[24]"INSTITUTION ORDER No. 507 (Revision)

"SUBJECT: POLICY AND PROCEDURES FOR INMATE SUBSCRIPTIONS TO NEWSPAPERS AND MAGAZINES

"I. GENERAL POLICY

A. In accordance with Penal Code Section 2600, inmates may subscribe to newspapers and magazines accepted for distribution by the United States Post Office with the following provisions:

1. The Prison has the authority to exclude obscene publications, (as defined in Penal Code Section 311) any information regarding the obtaining of such publications and any publications or writings which would tend to incite the following: Murder, arson, riot, violent racism, or any other form of violence, gambling or a lottery.

2. In the interest of institutional security and the ultimate return of the inmates to society, publications which characteristically advocate or tend to incite acts which are a misdemeanor or a felony may be excluded. Publications dealing with detailed techniques of crime will not be permitted. Individual issues of an otherwise approved publication may be subject to confiscation if in violation of PC 2600 or PC 311.

B. The amount of publications permitted in the possession of inmates will be subject to limitations as specified in other San Quentin Regulations. Periodicals or publications in excess of the authorized amounts must be disposed of.

C. Pictures or other material from publications will not be displayed or collected in scrap books which taken as a whole predominately appeal to prurient interest.

"II. GUIDELINES AS TO ACCEPTABILITY OF PUBLICATIONS

A. Generally acceptable publications: mass circulation news magazines, professional and trade journals, outdoor and sports magazines.

B. Publications not acceptable: publications dealing with firearms, explosives, locksmithing, criminal techniques which tend to incite the commission of misdemeanors or felonies.

C. Guidelines [Par.] 1. Violence includes incitement to rebellion, insurrection, revolution in or out of prison, violence by one group against another, sadomasochist type of publications promoting perversion and violence against the person. [Par.] 2. Obscene publications [Par.] a. In general, publications featuring the nude figure are acceptable. [Par.] b. Publications which feature nudity in the context of either implicit or implied felonious acts, i.e., homosexual behavior, bestiality, will be excluded if the predominate [*sic*] appeal is to prurient interest.

"III. PROCEDURES FOR SUBSCRIBING TO NEWSPAPERS AND MAGAZINES

A. Newspapers ordered for inmates shall be ordered through the Canteen with the exception of those that are questionable. Single copies of questionable newspapers shall be purchased through the Librarian for review by the Associate Warden, Classification and Treatment, at the requesting inmate's expense.

B. All inmate magazine orders shall be presented to the Librarian. Single copies of questionable magazines will be purchased for review by the Associate Warden, Classification and Treatment, at the requesting inmate's expense.

C. In the event a single copy of a magazine is needed for review prior to approval or disapproval, the inmate will pay the cost of same. If the magazine is approved, the copy will be given to the inmate. If disapproved, it will be destroyed.

D. Approval or disapproval of subscriptions is delegated to the Associate Warden, Classification and Treatment; the institutional librarian will handle the reception of the inmate request and transmission to the Trust Office of those approved. The disapproved request will be returned to the inmate."

[25]Order No. 507 is concerned solely with newspapers, magazines, and other periodical publications. San Quentin Institution Order No. 408, which has been alluded to

lications may be excluded if their subject matter is among those set forth in section 2600—i.e., if they are obscene (as defined in § 311 of the Pen. Code)[26] or tend to incite violence or gambling. It goes on to provide, however, as follows: "In the interest of institutional security and the ultimate return of the inmates to society, publications which characteristically advocate or tend to incite acts which are a misdemeanor or a felony may be excluded. Publications dealing with detailed techniques of crime will not be permitted. Individual issues of an otherwise approved publication may be subject to confiscation if in violation of PC 2600 or PC 311."

It is the application and validity of Order No. 507, and particularly the last-quoted paragraph, which is here in issue.

On March 21, 1969,[27] petitioner Ingram, pursuant to the procedure set forth in Order No. 507 for review of magazines not previously approved (see fn. 24, *ante*), filed with the warden a request that he be permitted to purchase a single copy of "Realist" magazine for examination and approval. On March 24, 1969, petitioner Ingram received a form from the acting prison librarian indicating that "this magazine has been disapproved." No reason for disapproval was given.[28] Petitioner's subsequent inquiry in the matter was not answered by prison authorities.[29]

On February 24, 1969, petitioner Ingram wrote a letter to Dr. Walter Houston Clark, retired Professor of the Psychology of Religion, Andover Newton Theological School, Newton Centre, Massachusetts. In the letter petitioner explained that he was an inmate at San Quentin serving a

---

above in connection with the matter of approved vendors, requires approval of the prison librarian prior to book purchases, and it would appear that the subject-matter standards applied in such cases are similar to those set forth in Order No. 507.

[26]Insofar as is here relevant section 311 of the Penal Code, provides that " 'Obscene matter' means matter, taken as a whole, the predominant appeal of which to the average person, applying contemporary standards, is to prurient interest, i.e.. a shameful or morbid interest in nudity, sex, or excretion; and is matter which taken as a whole goes substantially beyond customary limits of candor in description or representation of such matters; and is matter which taken as a whole is utterly without redeeming social importance."

[27]The version of Order No. 507 in effect at the time here relevant was similar in all relevant respects to the March 10, 1970, revision which is set forth in footnote 24.

[28]A version of Order No. 507 in effect prior to February 10, 1969, required that a reason for disapproval be given. A revision dated February 10, 1969, deleted that requirement, as have all subsequent revisions.

San Quentin Institution Order No. 408, which deals with the purchase of *books* by inmates (see fn. 25, *ante*) presently requires that a reason for disapproval be given when a proposed book purchase is disapproved.

[29]During this same general period of time petitioner Ingram sought to obtain a copy of "Avant-Garde" magazine but was informed that it had previously been disapproved. He was not informed of the reason for such prior disapproval.

sentence for sale of marijuana,[30] and that he planned to undertake a challenge of the constitutionality of marijuana laws on the ground, among others, that marijuana is an aid to spiritual enlightenment and laws pertaining to it infringe the free exercise of religion. He asked Dr. Clark to furnish him with a copy of an article written by Dr. Clark and Dr. Timothy Leary entitled "Religious Implications of Consciousness—Expanding Drugs."

Dr. Clark responded to this letter on March 3, 1969, sending under separate cover the article requested along with several other articles and documents upon the same subject.[31]

Petitioner Ingram received Dr. Clark's letter but he did not receive the enclosures. On March 28, 1969, he received a memorandum from the associate warden stating that the subject enclosures would not be transmitted to petitioner but would be "placed in [his] property." The reason given for this action was as follows: "In as much as drug usage as covered in the material you received is a crime, either a felony or a misdemeanor, you will not be permitted to accumulate a library of materials advocating or favorable to the use of drugs."

Petitioner Ingram thereupon directed a memorandum to the associate warden complaining that his rights under section 2600 were being violated. He pointed out that section 2600 did not authorize exclusion of material on the ground stated in the associate warden's memorandum and urged that Order No. 507 was invalid insofar as it permitted such exclusion. The associate warden sent the following answer: "We are interpreting PC 2600 as not allowing introduction of materials advocating crimes or teaching the techniques of committing crimes. We will not allow the publications on techniques of locksmithing, safecracking nor will we permit materials advocating the use of narcotics. You have the right to believe in whatever you wish but I do not believe a State prisoner has a right to materials that encourage him in the commission of further felonies."

A further memorandum from the associate warden to petitioner Ingram on November 13, 1969, stated the position of prison authorities as follows:

---

[30]The abstract of the judgment pursuant to which petitioner Ingram is now confined reflects that on August 18, 1967, he was found guilty of selling marijuana in violation of section 11531 of the Health and Safety Code; that probation was denied; and that he was sentenced to state prison for the term prescribed by law.

[31]In addition to the article entitled "Religious Implications of Consciousness—Expanding Drugs," Dr. Clark sent materials entitled (1) "The Mystical Consciousness and World Understanding"; (2) "Testimony before the Drug Commission of the Massachusetts Legislature, June 3, 1968"; (3) "A Few References on Religion and Psychedelic Substances"; and (4) "LSD as a Means of Exploring the Nonrational Components of the Religious Consciousness."

"I will not permit any written material that advocates, encourages or presents in an enticing manner the use of illegal drugs or narcotics. We are constrained by our obligations as ratified in the Penal Code to provide programs conducive to rehabilitation and good management. Conversely, we cannot be in the position of encouraging convicted felons to further violate the law. I will note for the record that your litigation in this area is directed to the legalization of narcotics, and not as to your guilt or innocence in your current commitment."[32]

On December 9, 1969, in response to a letter from a member of the Assembly concerning this matter, the assistant to the Director of Corrections stated that the Director supported San Quentin prison authorities in this matter.

In this state we have long since abandoned the medieval concept of strict "civil death" and have replaced it with statutory provisions seeking to insure that the civil rights of those convicted of crime be limited only in accordance with legitimate penal objectives. The 1968 amendments to part 3, title 1, chapter 3 of the Penal Code, which resulted in the enactment of section 2600 in its present form, represent the most recent legislative effort in this direction. ■ As we have suggested above, the 1968 amendment to section 2600 in effect constitutes a prison "bill of rights" which sets forth four basic guarantees which are retained by persons sentenced to imprisonment. Those guarantees are, generally speaking, (1) to inherit property, (2) to correspond confidentially with attorneys and public officials, (3) to own written material produced during imprisonment, and (4) to purchase, receive, and read published writings.

■ It is the fourth of these guarantees whose lineaments we are here called upon to define. At the outset it is clear that the strong language chosen by the Legislature to state the basic right indicates an intention that any limitation on that right beyond those specifically set forth is to be viewed with circumspection. Thus, the basic right is "To purchase, receive, and

---

[32] In response to this memorandum petitioner Ingram directed a memorandum to the associate warden which pointed out, among other things, that many newspapers and magazines of general circulation contained articles concerning activities prohibited by state law—such as seduction and adultry. The associate warden answered in part as follows: "I think it reasonable to eliminate publications which taken as a whole glorify, advocate, or promulgate the commission of felonies for which prisoners are serving sentences, thus encouraging further violations of law either in or out of prison. The occasional article in Playboy, Life, various newspapers, etc., which may be favorable to the use of narcotics would not necessarily be grounds for banning such publications. It is a matter of emphasis. [Par.] I will note parenthetically that I doubt if we have anyone incarcerated for seduction or adultry. [Par.] Prisons are often accused of being schools for crime. The least we can do is to keep the school from acquiring textbooks."

read any and all newspapers, periodicals, and books accepted for distribution by the United States Post Office."

The basic right is subject to express limitations of two kinds. The first of these relates to *subject matter* and proceeds by listing specific subject-matter categories within which prison authorities may exercise a right of exclusion. The second relates to matters of institutional necessity such as the discovery of contraband and considerations of space within the prison.

 As we have indicated above, we do not believe that the considerations of institutional necessity set forth in this second group of limitations are the only such considerations which prison authorities may utilize in order to govern the time, place, and manner under which the basic right is to be exercised. As long as the right *is in fact* exercised and protected reasonable limitations of this nature are to be tolerated.

 We observe, however, that there is a fundamental difference between this group of limitations—which may be characterized as limitations of "time, place and manner"—and the first group of limitations dealing with the subject matter of materials which may be excluded. The limitations comprising this first group impinge directly upon the basic right involved since they may *prevent access to* some reading material. In other words, the guarantee insures access to "any and all" printed materials *except* those excluded under this group of subject-matter limitations.

We think that these subject-matter limitations should be construed in the light of their manifest purposes. Those purposes as we conceive them are only two: (1) to prevent access to obscene materials, and (2) to prevent access to materials tending to incite certain activities which pose a distinct threat to prison discipline, i.e., violence and gambling.

 Although at some future time the Legislature may amend section 2600 to permit the exclusion of published materials which, in the opinion of prison authorities, are not "conducive to rehabilitation" in that they "characteristically advocate or tend to incite acts which are a misdemeanor or a felony,"[33] it is manifest that the present section does not permit exclusion on such broad grounds. Rather, the judgment of the Legislature expressed in section 2600 would seem to be that free access to all printed materials which are accepted for distribution by the United States Post Office—excepting those which are obscene or which tend to incite activities posing a threat to prison discipline—is more in accord with legitimate penal objectives than limited access according to the views of particular prison authorities on the rehabilitative effect of such materials. We do not consider this view to be wholly lacking in rational support. It may well be that even persons who

---

[33]We express no present opinion as to the constitutionality of such provision.

have committed antisocial acts warranting their imprisonment may derive greater rehabilitative benefits from a relatively free access to the thoughts of all mankind as reflected in the published word than they would derive from a strictly controlled intellectual diet.[34]

We do not wish to imply, however, that materials such as those here in question may under no circumstances be excluded by prison authorities. As we have indicated, section 2600 clearly permits the exclusion of "any matter of a character tending to incite . . . any . . . form of violence." It might well be that under particular prison circumstances, such as for example a narcotics problem *within* the prison, material tending to encourage and justify the use of narcotics might have a tendency to incite violent situations. In such a case such material might be properly excluded on the indicated narrow ground.[35] We hold only that under section 2600 of the Penal Code prison authorities have no authority to exclude, on the ground that in their view it has an adverse rehabilitative effect, published material which is accepted for distribution by the United States Post Office.

For the foregoing reasons we conclude that San Quentin Institution Order No. 507 is invalid insofar as it permits prison officials to exclude published materials on the broad ground that they "characteristically advocate or tend to incite acts which are a misdemeanor or a felony." The published materials sought by petitioner Ingram, although they might be properly excluded on some narrower ground set forth in section 2600, may not be excluded on the broad ground stated.

Our conclusion on this point renders unnecessary a present consideration of petitioner Ingram's further contention that exclusion of materials on marijuana and its use as a purported agent of spiritual enlightenment unreasonably impedes his access to the courts.

Finally, we are of the view that full and effective implementation of the guarantees set forth in section 2600 requires that prison authorities specify and communicate to affected inmates their reasons for excluding publications sought to be purchased pursuant to prison procedures.[36]

---

[34]It must be recognized that a rule giving authorities the right to exclude "publications which characteristically advocate or tend to incite acts which are a misdemeanor or a felony" (Order No. 507) places in such authorities a vast degree of discretion as to what publications will or will not be received by inmates. As the associate warden put it in one of his memoranda in this matter, "It is a matter of emphasis." (See fn. 32, *ante.*)

[35]Whenever prison authorities exclude published material on any of the grounds set forth in section 2600 the affected inmate may of course seek judicial review of that action by means of habeas corpus.

[36]Counsel for petitioner Ingram has provided us with a copy of a document which purports to be a San Quentin Prison directive listing various periodical publications which have been disapproved for receipt by prisoners. No reasons for disapproval ap-

*Petitioner Harrell's Appeal Rights*

 Petitioner Harrell raises a contention which is not related to those concerning prisoners' rights which we have treated above. He urges that he was denied the right to appeal from the judgment of conviction upon which his imprisonment is based.

On December 19, 1966, petitioner Harrell, who was represented by retained counsel, pleaded guilty to a charge of burglary (Pen. Code, § 459); the court found that the crime was of the second degree. On April 10, 1967, he again appeared with retained counsel and was sentenced to state prison for the term prescribed by law but with the minimum term specified at six months.[37]

On April 20, 1967, petitioner Harrell, whose relationship with his retained counsel had apparently been terminated at sentencing, executed and delivered to prison authorities a handwritten notice of appeal in propria persona. Failing to receive any notification or acknowledgment that his appeal had been filed, petitioner on June 12, 1967, filed in the trial court a petition in propria persona seeking to obtain such notification or acknowledgment and also requesting the clerk to proceed with preparation of the record on appeal. The petition was denied by the trial court on the ground that petitioner had failed to comply with section 1237.5 of the Penal Code, which provides in general that no appeal can be taken from a judgment of conviction upon a plea of guilty unless a certificate of probable cause for such appeal has been filed by the trial court.[38]

On June 21, 1967, petitioner filed a statement and motion for certificate of probable cause pursuant to section 1237.5. This motion was denied, as were two subsequent motions of identical purport. In support of these motions petitioner alleged inter alia that a motion to withdraw his guilty plea (Pen. Code, § 1018) had been improperly denied; that the sentence had resulted from an unkept plea bargain; and that he had not been given sufficient time to study the probation report prior to sentencing.

---

pear in this document. In the future no published material accepted for distribution by the United States Post Office—whether or not such material appears on any list of disapproved publications—may be excluded unless a reason or reasons within the purview of section 2600 are specified and communicated to the prisoner seeking to purchase such material.

[37]Petitioner Harrell was under 23 at the time of the offense and the court therefore had the power to specify a six-month minimum term. (Pen. Code, § 1202b.)

[38]Section 1237.5 provides: "No appeal shall be taken by defendant from a judgment of conviction upon a plea of guilty or nolo contendere, except where: (a) The defendant has filed with the trial court a written statement, executed under oath or penalty of perjury showing reasonable constitutional, jurisdictional, or other grounds going to the legality of the proceedings; and (b) The trial court has executed and filed a certificate of probable cause for such appeal with the county clerk."

█ It is clear that petitioner's notice of appeal, which was executed and delivered to prison authorities on the tenth day after judgment, was timely filed. (*People* v. *Rapp* (1966) 64 Cal.2d 643, 646 [51 Cal.Rptr. 247, 414 P.2d 375], and cases there cited.) █ Moreover, the allegations contained in petitioner's unsuccessful applications for a certificate of probable cause clearly indicate that he sought review on appeal not of the validity of the guilty plea itself, but of proceedings occurring subsequent to the entry of the plea. The requirements of section 1237.5 of the Penal Code were therefore inapplicable. (*People* v. *Ward* (1967) 66 Cal.2d 571, 574 [58 Cal.Rptr. 313, 426 P.2d 881]; *People* v. *Delles* (1968) 69 Cal.2d 906, 909-910 [73 Cal.Rptr. 389, 447 P.2d 629].) The clerk of the superior court in which the notice of appeal was filed should therefore be directed to prepare the record on appeal.[39]

The foregoing conclusion renders it unnecessary that we consider petitioner Harrell's additional contention that he was entitled to have counsel appointed to assist him in perfecting his appeal.

*Disposition*

Petitioners Harrell, McKinney and Ingram shall be permitted to give and receive mutual legal assistance, to have access to the courts, and to receive published materials, in accordance with the views expressed in this opinion.

The application of petitioner Harrell insofar as it complains that he was denied the right to appeal will be treated as a petition for a writ of mandate. The clerk of the Superior Court of the County of Alameda, in which the appeal was filed, is directed to proceed with the preparation of the record on appeal.

Except to the extent that the relief prayed for has been provided herein, in each of the above proceedings (Crim. 13222, Crim. 13383, Crim. 13855, and Crim. 13888) the order to show cause is discharged and the petition for a writ of habeas corpus is denied.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

Petitioner's application in Nos. 13383 and 13855 for a rehearing was denied July 15, 1970, and the opinion was modified to read as printed above. Peters, J., was of the opinion that the petition should be granted.

---

[39]In view of the recent amendment to the California Rules of Court (rule 31(d), 2d par., effective January 1, 1970) we anticipate that problems of this nature will be avoided in the future.