[Crim. Nos. 19330, 19886. First Dist.. Div. Three. May 23, 1980.]

In re RICHARD T. FRENCH et al., on Habeas Corpus.

[Crim. Nos. 19596, 19885. First Dist., Div. Three. May 23, 1980.]

In re CARLIN CARPENTER et al., on Habeas Corpus.

COUNSEL

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Clifford K. Thompson, Jr., Gloria F. DeHart and Karl S. Mayer, Deputy Attorneys General, for Appellant.

Michael Satris, under appointment by the Court of Appeal, and Donald Specter for Respondents.

OPINION

**RHODES, J.\***—Five prisoners at San Quentin State Prison brought these lawsuits after spouses or friends were indefinitely excluded from the prison following refusals by the visitors, all women, to submit to fully unclothed body searches. The searches were requested because prison authorities suspected the women of attempting to bring contraband into the prison. ■ We hold, in accord with the ruling below, that the initial response of the prison, to prohibit the women from visiting the prison indefinitely, was not "necessary for the reasonable security of the institution" and violated Penal Code section 2601, subdivision (d). ■ We also hold that the manner in which the prison is complying with the trial court's injunction, allowing the women into the prison after strip searching them, but only for noncontact visits, violates statewide administrative regulations pertaining to contact visits.

*Assigned by the Chairperson of the Judicial Council.

In August and September 1978, respectively, Carol French and Brenda Owen arrived at San Quentin Prison to visit their husbands, who were inmates there. At the main gate each woman was asked by a male officer to submit to an "unclothed body search." Each woman refused.

According to the pleadings, the strip searches of Ms. French and Ms. Owen were requested based on "specific, confidential information, deemed reliable by the staff" that Ms. French was bringing drugs into the prison and Ms. Owen "contraband."[1] However, the warden concedes that such confidential information is not normally reliable. Of the 9,000 monthly visitors to San Quentin only 10 or 12 are asked to submit to searches. Eighty to 90 percent of these persons consent to be searched. Yet these searches *never* produce contraband and the persons so searched are not treated with suspicion on future visits. Nonetheless, pursuant to a per se but then unofficial San Quentin rule,[2] the refusal by Ms. French and Ms. Owen to submit to a search was deemed "a tacit admission of attempting to smuggle contraband."

Through counsel, inmates French and Owen pleaded under oath that their wives refused to submit to the searches because they were menstruating and because Ms. Owen "was under the impression that a male guard would perform" the search of her person. It does not appear that either woman had had previous experience with the search procedures. Thus, there is no reason to believe that they were aware that the body searches would have been conducted by women and would not have included digital probing.[3] Moreover, even had the procedures been known to them it is irrefutable that the full search is a profoundly intrusive event.[4]

---

[1]Section 3173, subdivision (e) of title 15 of the California Administrative Code provides that a search of a visitor's person may be conducted "when there is substantial reason to believe the visitor is attempting to smuggle unauthorized items or substances in or out of the institution."

[2]According to documents attached to the state's request for stay the "tacit admission" rule was not officially adopted by the prison until October 1, 1978. Until that time the rule merely stated "Any person refusing to be searched may be denied entrance by the visiting lieutenant." (San Quentin Institution Order No. 222 VI.A.9.C.) It is thus unclear whether Ms. French or Ms. Owen were informed in advance of the full consequence their refusals might entail.

[3]This information appears in the record as rules VI.B.1. and VI.B. 4-6 of San Quentin Institution Order No. 729 (issued June 1, 1977).

[4]The rules cited in footnote 3, *ante*, indicate that Ms. French and Ms. Owen would have been asked to remove their clothing one article at a time, to remove their dentures if appropriate, to submit to a close inspection of the ears, mouth, armpits, and breasts, to run their fingers through their hair, to raise each leg and to wiggle their toes, to

Because refusal to submit to a strip search was deemed by San Quentin authorities to be a tacit admission that smuggling had been attempted, the refusal was taken as indicating that a "serious...violation of rules" had occurred. (Cal. Admin. Code, tit. 15, § 3177, subd. (c)(9).) Ms. Owen thus received a letter from Warden George Sumner informing her: "I am hereby denying your visiting privileges at San Quentin with any inmate for an indefinite period of time. You may reapply to me in six months to possibly have your visiting privileges restored...." Ms. French received a similar letter from a deputy prison administrator. During the course of the proceedings below San Quentin modified this policy slightly to make reconsideration at the end of six months mandatory.[5]

Inmates French and Owen sought relief by way of habeas corpus in Marin County Superior Court. Judge Wilson, after finding that the petitioners had exhausted their administrative remedies, granted the writ. He held that the indefinite suspension of visiting privileges violated Penal Code section 2601, subdivision (d) which provides that "Notwithstanding any other provision of law, each [prisoner]...shall have the following civil rights:...[¶] "(d) To have personal visits; provided that the department may provide such restrictions as are necessary for the reasonable security of the institution."

One week later the parties were back in court. The Attorney General moved for reconsideration.[6] The habeas petitioners moved to broaden the court's order or, alternatively, to hold San Quentin's warden in contempt. Prison officials had complied with the letter of the superior court's ruling and had permitted Ms. French and Ms. Owen to visit their husbands. However, the prison was not content merely to compel the women to submit to strip searches each time they wished to enter

"bend forward and using both hands to spread [their] cheeks," and to "cough and bear down." In addition they would have been informed that they would be required to remove such items as Tampax or sanitary pads, and that these would then be "taken apart and examined."

[5]This was pursuant to a directive issued by a deputy director of the Department of Corrections to the warden to conform San Quentin's rule to title 15, California Administrative Code, section 3177, subdivision (c)(9)(A), which provides that when a visitor is in serious violation of a rule: "that individual's future visits may be restricted to the degree necessary to prevent further violations during subsequent visits, or the individual's approval to visit may be suspended for not longer than six months before reconsideration will be given, upon written request for such reconsideration. If approval to visit is not restored at that time, further consideration will be given at intervals not to exceed six months, upon request for such reconsideration."

[6]It was at the hearing on this motion that Warden Sumner testified and much of the evidence cited in this opinion was introduced.

San Quentin. The prison had also forbade contact visits between the spouses.[7]

In addition, San Quentin authorities had continued to apply its exclusion policy to any other visitor refusing to submit to a search. As a result, while the postjudgment motions in *In re French* were pending, three other San Quentin prisoners, Carlin Carpenter, Donald Parrish, and David Elliot, were forced to bring a second habeas petition. Women attempting to visit these men had refused to submit to body searches and had had their visiting privileges suspended indefinitely. Counsel for the inmates certified that to the best of his knowledge "[e]ach of the visitors refused to submit to the body search on the ground that prison authorities did not have sufficient reason to request such a search and that the request for the searches was a means of harrassment and intimidation."[8] The Attorney General attempted to distinguish the court's decision in *In re French* on the ground that the women prevented from visiting Carpenter, Parrish and Elliot were not the spouses of these men.

Judge Wilson issued three separate rulings. First, he affirmed that suspension of visiting privileges was an unnecessarily restrictive and hence unlawful response by the prison. Second, he found the same reasoning applicable to nonspouses as well as spouses and ordered that the petition in *In re Carpenter* be granted on behalf not only of the petitioners but of "all other inmates similarly situated." Finally, the court refused to interfere with the restriction on contact visits stating that the latter did not impinge on the prisoners' statutory right to be visited.

The Attorney General appeals the first two rulings. These appeals have been consolidated with a habeas petition filed by the prisoners in this court seeking relief from the prohibition against contact visits. We address the question raised by the appeals first.

I.

Penal Code section 2601, subdivision (d) guarantees the following: "Notwithstanding any other provision of law, each such person shall have the following civil rights:. . .(d) To have personal visits; provided

---

[7]The prisoners alleged not only that the double restriction was punitive and unnecessary but that since nearly all visits at San Quentin are contact visits, the prison was not physically equipped for noncontact visits and their wives were forced to suffer through long waiting periods before access was permitted.

[8]The record does not indicate why the prison wanted to search these women.

that the department may provide such restrictions as are necessary for the reasonable security of the institution." ▇▇▇ Objectively, the record in this case makes it very clear that, in order to assure the security of the institution, San Quentin does not need to bar further visits by a visitor who refuses one time to submit to a strip search.[9]

First, the conclusion that the visitors here were actually attempting to smuggle contraband in was based on two uncertain premises. Since contraband is never found on individuals consenting to be searched, the warden could not say that any confidential informant had in fact ever accurately predicted a smuggling attempt; what accuracy is to be attributed to such information depends entirely on the inference to be drawn from the fact that 10-20 percent of visitors asked refuse to submit to a strip search. It is self evident that an individual might decline on grounds unrelated to crime.[10]

However, the uncertainty of the security threat involved is not the principal objection here. San Quentin officials are concerned with the effect of drugs that surreptitiously enter the prison and their entitlement to follow up on any information pertaining to that threat is not questioned. Nor have the petitioners questioned the prison's entitlement to condition entry of suspect individuals by consent to a strip search. The objection, rather, is to the unnecessary lengths the prison wishes to go to neutralize a speculative threat to security.

For the testimony showed that however real the threat is, it is thoroughly neutralized simply by informing the suspect visitor that he or she would be strip searched prior to future visits. This is the result of

---

[9]At first blush it appears that the Director of the Department of Corrections likewise believes that a ban is not an appropriate response. For the director has promulgated a rule of statewide application that provides that when a person has refused to submit to a search: "Visits may be denied until the individual agrees to submit to a search of their clothing and person prior to visiting, or until such time as institution officials no longer have substantial reason to believe the individual will attempt to smuggle contraband items or substances into the institution." (Cal. Admin. Code, tit. 15, § 3177, subd. (c)(3)(A).) The most reasonable construction of the rule is that visitation rights must be restored once the person consents to a subsequent search, or when subsequent refusals to be searched are determined to have a nonsuspect basis. The record demonstrates, however, that a deputy director of the department approved San Quentin's visitor rule as consistent with section 3177, subdivision (c)(3)(A), and it would therefore be futile to rest our opinion solely on the basis of departmental regulations. See footnote 5, *ante.*

[10]That other factors might be involved, such as dignity and religious belief, is underscored by the fact that the United States Supreme Court only narrowly and reluctantly approved postvisit visual strip searches of pretrial detainees. (*Bell* v. *Wolfish* (1979) 441 U.S. 520, 558-559 [60 L.Ed.2d 447, 480-482, 99 S.Ct. 1861, 1884].)

two factors. First, strip searches are, though not flawless, highly effective means of discovering contraband. Second, and most critical, advance warning that a search will be conducted acts as a powerful and perhaps perfect deterrent. The warden indicated he would never expect to find contraband on a visitor who consented to a search. Since the visitors with whom we are concerned here could not enter the prison until they consented to a search it follows that such visitors would no longer be security threats.[11]

The force of this logic compels the Attorney General to find other justifications for the exclusion policy. To exclude a suspected would-be smuggler, it is said, would serve as a potent deterrent to other would-be smugglers who would otherwise be risking only being turned away on the particular day they are asked to submit to a search. This is undoubtedly so. But that is not to say that being forced to undergo a strip search on every visit after a one-time refusal is not also a potent deterrent. It is also predicted that to have to search one-time refusers on all future visits, rather than simply excluding them, would create a hardship for the prison staff. This is a prediction that naturally gives us pause. But we are reminded that fewer than three years ago San Quentin did not indefinitely exclude visitors who refused to submit to strip searches; it merely conditioned future visits on consent to be searched.[12] Warden Sumner simply brought the new rule with him when he assumed his position at San Quentin in 1977; he could not say that the prior policy had overburdened the staff such that security had been threatened.[13] While total exclusion would clearly be a more convenient procedure for the prison staff, section 2601, subdivision (d) permits the right to have personal visits to be restricted only on grounds of security.[14]

The principal argument advanced by the Attorney General to reverse the trial court's determination that the visitor exclusion policy violates

[11]We note that additional protection is afforded by the fact that the inmate is always strip searched after a contact visit. (Rule VI. B. 17, San Quentin Institution Order No. 222 (as of Sept. 1, 1978).)

[12]See footnote 2, *ante*. It also seems likely that the older system is the one contemplated by the department's statewide regulations. See footnote 9, *ante*.

[13]The warden appeared to concede that since it is the threat of the search that deters, few full searches would actually have to be conducted.

[14]A scenario was also depicted in the trial court wherein a would-be smuggler continuously refuses to submit to a search until, on a crowded day, he or she is inadvertently admitted without being searched. Suffice it to say that in the instant case we are confronted with but one refusal to submit to a search.

section 2601, subdivision (d) is that a court may not "second-guess" those judgments of prison authorities that have to do with the security of prisons. The argument relies exclusively on the Supreme Court's recent decision in *In re Price* (1979) 25 Cal.3d 448 [158 Cal.Rptr. 873, 600 P.2d 1330]. *Price* involved a ban placed on collective activities of the Prisoners Union at Soledad. Officials feared that if inmates were permitted to bargain collectively with prison administrators, the organizing process would create volatile tensions and rejection of any demands by such a Prisoners Union would lead to violence or widespread and deliberate misconduct. The court held that "[b]y any objective appraisal, the foregoing apprehensions [were] not inconsequential. . . ." and that it *could not* second-guess the determination that Prisoners Union meetings were a potential threat to the reasonable security of the institution. (*Id.* at pp. 454-455.)

The suggestion that the instant case is bound by the result in *Price* misconstrues the latter opinion and overlooks critical differences between these two cases. First, *Price* does not yield the conclusion that the Supreme Court, after a decade of acting as objective sentry over prisoners' rights, and almost always in the face of arguments involving prison security (*In re Brandt* (1979) 25 Cal.3d 136 [157 Cal.Rptr. 894, 599 P.2d 89]; *In re Reynolds* (1979) 25 Cal.3d 131 [157 Cal.Rptr. 892, 599 P.2d 86]; *Payne* v. *Superior Court* (1976) 17 Cal.3d 908 [132 Cal. Rptr. 405, 553 P.2d 565]; *In re Jordan* (1974) 12 Cal.3d 575 [116 Cal.Rptr. 371, 526 P.2d 523]; *In re Jordan* (1972) 7 Cal.3d 930 [103 Cal.Rptr. 849, 500 P.2d 873]; *In re Harrell* (1970) 2 Cal.3d 675 [87 Cal.Rptr. 504, 470 P.2d 640], cert. den. 401 U.S. 914 [27 L.Ed.2d 814, 91 S.Ct. 890]),[15] has now abandoned that role to prison officials.[16] The *Price* situation called for an educated prediction. The court took care to note that the fearful prediction by officials was objectively based. The court did not state that if circumstances were different it "would not" draw a conclusion contrary to that drawn by the Soledad authorities. The court merely said that given Soledad's "history of violent disruption" it "could not" reach a contrary conclusion. The court did advise that *its* decision to uphold the ban was not "carved in stone." (*Id.* at p. 455.)

---

[15]See also *In re Carrafa* (1978) 77 Cal.App.3d 788, 792-793 [143 Cal.Rptr. 848].

[16]We note that the Supreme Court's concern for prisoner rights predated the Legislature's repeal in 1975 of the longstanding statutory policy that a prisoner suffered "civil death" when he or she entered prison. (Former Pen. Code, § 2600, Stats. 1941, ch. 106, § 15, p. 1091, repealed, Stats. 1975, ch. 1175, § 2, p. 2897.)

Second, the issue before the Supreme Court was not the *necessity* of the ban. Once the reasonableness of the prison's fears regarding union activities was established, the ban on those activities followed necessarily.[17] The comparison with the instant case is therefore not apt. As we have discussed, the extent to which certain visitors pose security threats for San Quentin is not the issue upon which our dispositive objection to the exclusion policy rests. The objection goes to the unnecessarily restrictive means adopted to neutralize that threat.

Third, the ban on union meetings violated no specific prisoner right.[18] Thus, in assessing the necessity of the ban with respect to prison security under section 2600 (fn. 18, *ante*) no counterweight was presented. In the instant case, by contrast, the restriction violates one of the few prisoner rights[19] enumerated by the Legislature,[20] and one whose protection

[17]The court did take care to note, however, that mere membership in the union had not been forbidden, nor had "individual visitation and correspondence with outside union representatives." (*Id.* at p. 452, fn. 3.) The court had previously indicated that a prisoner could not be deprived of such rights without running afoul of section 2600. (*In re Brandt, supra; In re Reynolds, supra.*)

[18]Relying on *Jones* v. *North Carolina Prisoners' Union* (1977) 433 U.S. 119 [53 L.Ed.2d 629, 97 S.Ct. 2532], *Price* began from the premise that no constitutional right was involved in the desire of prisoners to meet collectively. The only "right" involved, therefore, was the nonconstitutional right of civilians to get together, one falling within the residue of rights protected by Penal Code section 2600: "A person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public."

[19]In declaring personal visits to be a prisoner right in 1975 the Legislature was following the recommendations of, among others, the State Bar of California Committee on Criminal Justice (Report & Recommendations on Sentencing & Prison Reform, recommendation 11, at p. 12 (June 1975)), the National Advisory Commission on Criminal Justice (Standards & Goals, Corrections, Standard 2.17 (1973)), the Boston University Center for Criminal Justice (Model Rules & Regulations on Prisoners' Rights & Responsibilities, pp. 56-57 (1973)); the National Council on Crime and Delinquency (Model Act for the Protection of Rights of Prisoners, § 7 (1972) in ABA Compendium of Model Correctional Legislation and Standards (1975 2d ed.)), and the National Sheriff's Association (Standards for Inmates Legal Rights, [¶] 19 (1974) (in Compendium, *supra*)).)

[20]Penal Code section 2601 provides in full that "Notwithstanding any other provision of law, each [state prisoner] shall have the following civil rights: "(a) To inherit, own, sell, or convey real or personal property, including all written and artistic material produced or created by such person during the period of imprisonment; provided that, to the extent authorized in Section 2600, the Department of Corrections may restrict or prohibit sales or conveyances that are made for business purposes.

"(b) To correspond, confidentially, with any member of the State Bar or holder of public office, provided that the prison authorities may open and inspect incoming mail to search for contraband.

"(c) To purchase, receive, read, and permit other inmates to read any and all legal materials, newspapers, periodicals, and books accepted for distribution by the United States Post Office, except those which describe the making of any weapon, explosive,

is seen as providing a general as well as individual benefit.[21] The significance of this fact cannot help but impact the degree of scrutiny required when prison officials seek to restrict the right in the name of security.[22]

For all of the foregoing reasons we believe that the Supreme Court's analysis in *In re Price* is fully compatible with our objective conclusion that barring persons from visiting inmate-spouses or inmate-friends at San Quentin solely on the basis of their one-time refusal to submit to a strip search is not "necessary to the reasonable security of the prison."

## II

We turn to the issue raised by the habeas petition. When ordered by the superior court to discontinue its indefinite exclusion of Ms. French and Ms. Owen, San Quentin officials complied by permitting the women to resume visiting but subject to two restrictions: the women had to consent to strip searches each time they wished to enter San Quentin, and they were not permitted to have contact visits.

---

poison or destructive device. Nothing in this section shall be construed as limiting the right of prison authorities (1) to open and inspect any and all packages received by an inmate and (2) to establish reasonable restrictions as to the number of newspapers, magazines, and books that the inmate may have in his cell or elsewhere in the prison at one time.

"(d) To have personal visits; provided that the department may provide such restrictions as are necessary for the reasonable security of the institution.

"(e) To initiate civil actions.

"(f) To marry.

"(g) To create a power of appointment.

"(h) To make a will.

"(i) To receive all benefits provided for in Sections 3370 and 3371 of the Labor Code and in Section 5069 of this code."

[21]A study done for the California Department of Corrections indicated a directly proportional relationship between opportunities for contact with the outside world while in prison and parole success (Department of Corrections, Annual Research Review (1970) 28; see also the fuller treatment by the researchers themselves in Miller, Explorations in Inmate-Family Relationships (1972) pp. 42-43.)

[22]The right to have personal visits is the only right enumerated in section 2601 to be qualified by the concern for security, and the qualification is similar to that found in section 2600. It thus follows that a similar standard is to be applied under each statute. At the same time, given that the Legislature enacted sections 2600 and 2601, subdivision (d) together (Stats. 1975, ch. 1175, § 3, p. 2897), to construe them identically would render section 2601, subdivision (d) redundant. The fact that the Legislature has singled it out is at least a signal to the courts that a claim that a restriction on the right is necessary for prison security should be scrutinized carefully, without the level of deference the Attorney General perceives operating in *In re Price*.

Contact visits are deemed to be a critical part of correctional policy in California.[23] Thus the Director of the Department of Corrections has promulgated the following rule: "Devices which preclude physical contact between inmates and visitors will not be used except as is necessary in individual instances where substantial reasons exist to believe that physical contact with a visitor, visitors or with other inmates will seriously endanger the safety of persons or the security of the institution, or as a temporary measure as punishment for willful failure or refusal to abide by regulations related to visiting." (Cal. Admin. Code, tit. 15, § 3170, subd. (d); see also §§ 3173, subd. (h) and 3173, subd. (p).)[24]

The restriction on contact visits was justified in the trial court by the warden's observation that a significant percentage of the contraband that enters San Quentin is attributable to the policy favoring contact visits. The observation, however, has no application to persons who are strip-searched prior to entry. As the warden himself testified, the mere threat of a full body search effectively inhibits any urge to bring contraband in on the part of the prospective searchee.[25] In conformity with our earlier conclusion, therefore, we must find that no "substantial reasons exist to believe that physical contact" between the visitors and inmates involved here "will seriously endanger. . .the security of the institution." Nor does it appear that the suspension of contact visits is a temporary punishment for a rule violation by an inmate.[26] We conclude

---

[23]Accord, *Campbell* v. *McGruder* (D.C. Cir. 1978) 580 F.2d 521, 548 fn. 57 [188 U.S. App. D.C. 258] ("elemental human right of physicial contact"); *Rutherford* v. *Pitchess* (C.D. Cal. 1978) 457 F.Supp. 104, 110; A.B.A., Tentative Draft of Standards Relating to the Legal Status of Prisoners, section 6.2(b) (1977) (in 14 Am.Crim.L. Rev. (1977) 500); National Conference of Commissioners on Uniform State Laws, Model Sentencing and Prison Reform Act (1979 supp.) 10 Uniform Laws Annotated 1.

[24]The director's rules are binding on individual institutions. (Pen. Code, §§ 2079; 5058, subd. (a).)

[25]The director's rules provide in part: "The degree of physical contact permitted between inmates and visitors. . . .will depend. . .upon the degree of risk visiting will present. . .for the introduction of dangerous contraband." (Cal. Admin. Code, tit. 15, § 3173, subd. (h).)

[26]Section 3173, subdivision (p) of title 15 of the California Administrative Code provides: "Inmates who are otherwise eligible for physical contact visiting may be temporarily denied such contact as a penalty for violations related to visiting, including the inmate's unauthorized use or possession of drugs, narcotics, money or other dangerous contraband that has been introduced into the institution."

that the director's rules prohibit San Quentin from compelling simultaneously both strip searches and noncontact visits.[27]

The judgments from which the state appeals are affirmed insofar as they enjoin the indefinite suspension of visiting rights; the petitions for habeas corpus, seeking relief from the suspension of contact visits, are granted.

White, P. J., and Feinberg, J., concurred.

A petition for a rehearing was denied June 20, 1980, and appellant's petition for a hearing by the Supreme Court was denied July 16, 1980. Manuel, J., was of the opinion that the petition should be granted.

---

[27]Contrary to the situation referred to footnote 9, *ante*, there is nothing in the record that indicates that the director has deemed the suspension of contact visits compatible with his own regulations.