[Crim. No. 22990. First Dist., Div. Two. Apr. 21, 1982.]

In re TERRY STONE et al., on Habeas Corpus.

924

COUNSEL

George Deukmejian, Attorney General, Robert H. Philibosian, Chief
Assistant Attorney General, William D. Stein, Assistant Attorney General, Robert R. Granucci and Karl S. Mayer, Deputy Attorneys
General, for Appellant.

Michael Satris, under appointment by the Court of Appeal, and Donald
Specter for Respondents.

OPINION

MILLER, J.—San Quentin Prison appeals from a minute order by the
Marin County Superior Court granting habeas corpus relief other than
a release from custody to prisoners at that institution and from a minute order denying the prison administration's request for reconsideration of the court's order.[1]

Terry Stone, Ruben Ruybal and Angelo Mendoza (hereinafter petitioners) petitioned the court for relief after spouses or friends were
indefinitely restricted to visits that did not permit physical contact because each visitor had at one time refused to submit to a body search at
the request of correctional officers. The searches were requested because prison authorities suspected each of these visitors of attempting to
bring contraband into the prison. Each visitor has subsequently expressed a willingness to submit to body searches in connection with
future visits in order to have the contact restrictions lifted.

The court determined that prison authorities could require a body
search of anyone suspected of carrying contraband and that anyone refusing such a search could be denied admittance into the prison.[2]
However, the court found that prison authorities could not limit a person who consents to a body search to a noncontact visit simply on the
basis of a prior refusal. In other words, the court ruled that once a visitor expresses a willingness to undergo a body search in order to have
the contact restrictions lifted, prison authorities must allow a full contact visit after successful completion of the search.

---

[1]California courts use the writ of habeas corpus not only to test jurisdiction, but also
to protect the fundamental rights of prisoners. (*In re Riddle* (1962) 57 Cal.2d 848, 851
[22 Cal.Rptr. 472, 372 P.2d 304].)

[2]Petitioners have not appealed from this part of the court's order; therefore, it will
not be reviewed.

In order to clarify the arguments advanced by the parties, it is instructive to briefly review the history of measures San Quentin Prison has taken to curb the threat of visitors smuggling contraband into the prison and the judicial response to these measures.

Any person coming onto the grounds of a Department of Corrections institution subjects his person, property and vehicle to search when there is substantial reason to believe the visitor is attempting to smuggle unauthorized items or substances into the institution. (Cal. Admin. Code, tit. 15, § 3173, subd. (e).) The type of activity that can provoke a body search is difficult to characterize but often falls far short of the type of information needed to support an arrest.[3]

Body searches at San Quentin require the visitor to remove all clothing and squat, cough and bend in conformance with instructions given by correctional personnel. These searches are visual only and do not physically intrude into the body cavities. They are conducted by correctional officers of the same sex as the visitor. If no contraband is discovered, the visitor is allowed a full contact visit with the prisoner. A contact visit allows face-to-face contact, limited touching and exchanges of affection with the prisoner.

It is prison policy not to force a body search on an unwilling visitor, but refusal to submit to the search is construed as a tacit admission that the visitor is concealing contraband on his/her person. The soundness of the assumption that everyone refusing to submit to the search is carrying contraband has been questioned.[4] Nevertheless, those who refuse are identified as potential security risks and restrictions are placed on their subsequent visits.

The restrictions placed on visitors who have at one time refused to submit to a body search have been a frequent subject of litigation. Prior

---

[3]This point is aptly illustrated by the circumstances surrounding the search requests in this case. When correctional officers noticed a lump under the clothing of petitioner Stone's visitor, they requested permission to perform a body search on her and her four-year-old daughter. Petitioner Ruybal's visitor set off the metal detector while being processed and was asked to submit to a body search. San Quentin authorities monitored a phone call between petitioner Reis and a female friend in which smuggling contraband into the prison was discussed. After this a female visitor was asked to submit to a body search.

[4]A court recently noted: "It is self evident that an individual might decline [a body search] on grounds unrelated to crime." (*In re French* (1980) 106 Cal.App.3d 74, 80 [164 Cal.Rptr. 800].)

to June 20, 1977, visitors who refused a body search were denied admission for that visit only and no subsequent security measures were taken. (*In re French* (1980) 106 Cal.App.3d 74, 81 [164 Cal.Rptr. 800].) On June 20, 1977, this policy was rescinded in favor of one. which provided that visitors who refused to submit to a body search would have their visiting rights cancelled indefinitely. Several prisoners sought relief from this indefinite suspension of visiting rights by way of habeas corpus proceedings in *In re French, supra.* Relief was accorded after the trial judge found that indefinite suspension of visiting privileges violated Penal Code section 2601, subdivision (d), guaranteeing prisoners the right to have personal visits.

The prison complied with the first ruling in *French* by allowing the visitors back into the prison but placed a dual restriction on all subsequent visits. If persons who had once refused to submit to a body search wished to resume visiting in the prison, they could do so but subject to two restrictions: They had to submit to a full body search each time they visited and all their future visits were relegated to a noncontact status. The petitioners in *French* returned to court alleging that this dual restriction was both punitive and unnecessary. (*In re French, supra*, 106 Cal.App.3d at p. 79, fn. 7.)

Subsequently, the trial court further defined the scope of its earlier ruling. First, the court affirmed that suspension of visiting privileges was an unnecessarily restrictive response by the prison to a one-time refusal to consent to a body search. Second, the court found this reasoning applicable to all visitors to the institution and not just spouses of prisoners.[5] (*In re French, supra*, 106 Cal.App.3d at p. 79.) But the trial court refused to interfere with the requirement that visitors who had at one time refused to consent to a body search submit to both a body search and noncontact restriction as the condition of being allowed back into the prison.

On appeal, the appellate court affirmed the lower court's ruling that the response of the prison in prohibiting visitors who had at one time re-

---

[5]Even after the first ruling in *French*, prison authorities had continued to apply the total exclusion policy to nonspouses who refused to submit to a body search. The prison justified this distinction after noting that the petition in *French* only concerned prisoners' spouses who had been barred from future visiting after refusing to submit to a body search. This interpretation spawned a second habeas petition on behalf of prisoners whose nonspouse visitors had had their visiting privileges suspended indefinitely after declining a body search request. (In re Carpenter (Super. Ct. Marin Co., No. 92596.) This second petition was consolidated with the proceedings in *French*.

fused a body search from visiting the prison again was not necessary for the reasonable security of the institution and was therefore in violation of Penal Code section 2601, subdivision (d). Furthermore, the court found that the imposition of the noncontact restriction in addition to the search requirement violated statewide administrative regulations pertaining to contact visits. The court ordered that the dual restriction could no longer be imposed. (*In re French, supra*, 106 Cal.App.3d at pp. 85-86.)

The prison initially implemented the *French* decision by imposing the single restriction of a body search condition upon subsequent visits by a person who had previously refused to submit to such a search and permitting full contact during visits. However, by memo dated September 15, 1980, from George Sumner, Warden of San Quentin, this policy was changed to impose the following restriction of noncontact visiting: "If the visitor refuses [the body search], he/she will be advised of the consequences of such refusal and not allowed to visit that day. Future visits will be restricted for an indefinite period on non-contact status without skin search unless new cause and administrative approval is received."[6]

The case at hand challenges this new institutional policy of imposing a blanket noncontact restriction on all subsequent visits by a person who once refused a body search request regardless of that person's subsequent willingness to undergo such a search in order to gain the amenities of a contact visit.

■ Any action by prison authorities to restrict the visitation rights of prisoners must be measured against the guarantee of section 2601, subdivision (d) of the Penal Code: "Notwithstanding any other provision of law, each such person shall have the following civil rights: ... (d) To have personal visits; provided that the department may provide such restrictions as are necessary for the reasonable security of the institution."

When a restriction upon visitation is imposed, the availability of another less restrictive alternative to accomplish the goal of reasonable security weighs against the restriction. *In re Bell* (1980) 110 Cal.App. 3d 818 [168 Cal.Rptr. 100], which also concerned noncontact visitation,

---

[6]In a letter to respondents' counsel, this policy was affirmed by Joseph M. Cavanagh, counsel for the Department of Corrections.

phrased the test succinctly: "If there is some less restrictive and equally effective means, other than the procedures challenged here, to promote the goal of preventing smuggling of contraband into San Quentin prison, the challenged procedures are not necessary to the security of the institution and are proscribed by Penal Code section 2601, subdivision (d)." (P. 822.)

Although *Bell* does not offer a solution to this controversy, it does make it clear that it is not enough that the challenged restriction on visitation be desired or expedient or consistent with legitimate security measures. In order to be upheld, a restriction on prisoners' visitation rights must be found to be *necessary* to the goal of reasonable institutional security. A restriction on the right of personal visits is not "necessary" if the goal that it is intended to promote can effectively be promoted by less restrictive means. (*In re Bell, supra*, 110 Cal.App.3d at p. 822.)

■ Thus, a proper determination of the question before us requires that we explore whether the blanket noncontact restriction imposed by the prison when a visitor refuses to submit to a body search is necessary to institutional security. More specifically we must explore the availability and effectiveness of other security measures which would promote the goal of institutional security while imposing a lesser restriction on the visitation rights of prisoners.

It is manifest that an indefinite contact restriction, such as that challenged here, is a severe restriction on the right of visitation. Noncontact visits are imposed when there is reason to believe that personal contact between the visitor and the prisoner would jeopardize institutional security, the safety of inmates or personnel, or would create an unreasonable risk for the introduction of contraband. (Cal. Admin. Code, tit. 15, § 3170, subd. (d).) During a noncontact visit, the prisoner is separated from his visitor by a transparent glass partition and they must use a "telephone" for voice communication. Furthermore, a noncontact restriction results in the dimunition of the length of visits and visiting times. If the visitor on noncontact status is the prisoner's spouse, she is excluded from participation in the family visiting program which allows extended visitation over several days and is very important in maintaining normal family relations. It also appears that a visitor on noncontact status will be denied visitation in the prison hospital.[7]

---

[7]Although restricted admittance to the prison hospital was never alleged in the habeas corpus petition or discussed at the hearing an affidavit was filed by petitioner

However, merely establishing the severity of the noncontact restriction alone is not enough to warrant judicial intervention. We must inquire whether there is a less restrictive, equally effective method of dealing with the reasonable security of the institution.

The petitioners vigorously argue that to require a body search in connection with future visits is a lesser restriction on visiting than the noncontact restriction presently being imposed. The trial judge had no trouble sustaining this conclusion. "... [I]t requires no particular expertise to conclude that the indefinite suspension of contact visits is more restrictive than requiring persons who have refused a body search to submit to such a search in the future as a condition of being allowed to visit." We do not reach a different conclusion.

Besides the differences in the length and time of the visits and the physical remoteness that a noncontact restriction obviously engenders, it is highly significant that the vast majority of visitors willingly submit to a body search in order to obtain a contact visit.[8] The visitors' willingness to submit to what the *French* court characterized as a "profoundly intrusive event" only emphasizes the value to which they attach their ability to touch their loved ones. (*In re French, supra*, 106 Cal.App.3d at p. 77.)

The record leads us to conclude that requiring a visitor to submit to a body search in order to enjoy a full contact visit is less restrictive on the right of visitation than the indefinite noncontact restriction presently imposed by prison authorities.

The courts have never asked prison administrators to establish procedures which would jeopardize institutional security solely because they provide a lesser restriction on visiting rights. Courts have only required that if the goal of reasonable institutional security can be effectively promoted by several different means, the least restrictive one be chosen. (See, e.g., *In re Harrell* (1970) 2 Cal.3d 675 [87 Cal.Rptr. 504, 470 P.2d 640]; *In re Jordan* (1972) 7 Cal.3d 930 [103 Cal.Rptr. 849, 500 P.2d 873]; *In re Brandt* (1979) 25 Cal.3d 136 [157 Cal.Rptr. 894, 599 P.2d 89].) Therefore, the only question left is whether the performance

---

Stone's wife stating that she had been denied entry into the prison hospital because of her noncontact status when she tried to visit her injured husband.

[8]*In re French* reports that 80 to 90 percent of persons consent to be searched. (*In re French, supra*, 106 Cal.App.3d at p. 77.)

of a body search before a visitor is allowed a contact visit is an alternative which will effectively promote the goal of preventing the smuggling of contraband into San Quentin Prison.

This question is central to the resolution of this controversy and its discussion occupies a good deal of the record. But, like the trial court, we believe that the effectiveness of a body search in preventing the smuggling of contraband is an issue squarely addressed and settled by *French*.

*French* indicates in very clear language that the single requirement that a visitor submit to a body search prior to a contact visit is a sufficient means of discovering contraband and is all that is necessary to provide for the reasonable security of the institution: "This is the result of two factors. First, strip searches are, though not flawless, highly effective means of discovering contraband. Second, and most critical, advance warning that a search will be conducted acts as a powerful and perhaps perfect deterrent. The warden indicated he would never expect to find contraband on a visitor who consented to a search. Since the visitors with whom we are concerned here could not enter the prison until they consented to a search it follows that such visitors would no longer be security threats." (*In re French, supra*, 106 Cal.App.3d at pp. 80-81.) The trial judge read the *French* decision as saying that "anything more than requiring body searches of visitors who have refused a body search is not necessary to the institution's security." We concur in this view.

The warden has indicated that he believes the noncontact restriction is a more effective security measure than requiring a body search. This assertion is entitled to serious consideration as prison officials are the ones who must deal with the problems created by lax security, and they should be entitled to a certain degree of flexibility in taking effective action. However, after a thorough review of the record, we find that the warden has relied mainly on his own opinions, conclusions, and speculations.[9] No showing has been made that the original procedure of allowing a contact visit after a full body search undermined the security of the institution, nor has there been any evidence presented that would attest to the greater effectiveness of the noncontact restriction.

---

[9]We decline to consider the trial transcript from another proceeding presented in appellant's reply brief. This testimony was not offered in evidence before the trial court and is clearly outside the scope of our review. (*Oldenkott v. American Electric, Inc.*

Indeed, the effectiveness of the body search is evidenced by the fact that a body search is requested when the prison initially has reason to believe that a visitor is attempting to smuggle unauthorized items into the institution instead of merely requiring that the visit be conducted with the noncontact restrictions imposed. Furthermore, after the completion of contact visitation, inmates exiting the visiting room are given unclothed body searches to check for contraband. It is hard to believe that the prison would take the time and trouble to impose this additional security precaution if they did not believe it to be a highly effective measure.

The warden has also asserted that the process of performing body searches consumes substantial time and casts substantial burdens on prison personnel. Two staff members are needed for each body search and each search requires approximately twenty minutes time. By contrast, it is alleged that the noncontact restriction is less burdensome on the correctional staff and less burdensome on the processing of other visitors. These are legitimate concerns, and we are reluctant to place unreasonable burdens on prison authorities in carrying out this court's order.

Yet we note that the record in this case is replete with the warden's assertion that if given the choice, he would prefer to impose both the noncontact and body search restrictions simultaneously when a visitor who has once refused a body search wants to resume visiting in the prison. This was the prison's practice prior to the court ruling in *French.* One need only speculate that if the double restriction had not been struck down by that court, it would be the practice today despite whatever administrative inconvenience it created.

It is evident that the warden and his staff fully recognize the value of visitation and they are to be commended for the attention and effort that they devote to accommodating such a large number of visitors.[10] However, it is not evident that to allow unrestricted contact visiting after completion of a body search would greatly add to the warden's security problems or his administrative burdens.

---

(1971) 14 Cal.App.3d 198, 207 [92 Cal.Rptr. 127]; *Weller v. Chavarria* (1965) 233 Cal.App.2d 234, 246 [43 Cal.Rptr. 364]; *Green v. Green* (1963) 215 Cal.App.2d 31 [30 Cal.Rptr. 30].)

[10]For the calendar year 1979, San Quentin had 100,789 visitors. Figures were not available for 1980, but they were expected to reflect a similar number.

The introduction of contraband into the prison by visitors is a substantial concern and measures must be taken to deter those who threaten the security of the institution. However, it does not appear that the only means of attaining this goal must entail the severe restriction on visitation that a noncontact restriction imposes. Besides being less restrictive than noncontact visiting, the requirement that a visitor submit to a body search prior to entry provides for the reasonable security of the institution at least as well as the noncontact restriction presently imposed. Accordingly, we find that the imposition of the indefinite noncontact restriction based on a one-time refusal to submit to a body search is not necessary to provide for the reasonable security of the institution and is therefore proscribed by Penal Code section 2601, subdivision (d).

So that there will be no misunderstanding about the scope or implications of this ruling, we hold that the prison cannot continue to apply its blanket noncontact restriction after a visitor has refused to submit to a body search when there is a less restrictive measure available to adequately protect against the danger of importation of contraband. Specifically, when a visitor who has at one time refused to consent to a body search returns to the institution and willingly submits to the search, full contact visitation must be restored.

The judgment is affirmed.

Rouse, Acting P. J., and Smith, J., concurred.

A petition for a rehearing was denied May 21, 1982.