[No. AO20746. First Dist., Div. Two. Jan. 12, 1984.]

In re CLYDE PARKER on Habeas Corpus.

584

**COUNSEL**

John K. Van de Kamp, Attorney General, Thomas A. Brady and Kenneth C. Young, Deputy Attorneys General, for Appellants.

Donald Spector, under appointment by the Court of Appeal, Michael Satris and Charles S. Bishop for Respondent.

**OPINION**

**KLINE, P. J.**—Reginald Pulley, warden of the prison at San Quentin and Daniel T. McCarthy, Director of the California Department of Corrections, appeal from an order enjoining prison officials from enforcing any regulation prohibiting inmates from establishing regular passbook savings accounts in banks and savings and loan institutions.

San Quentin inmate Clyde Parker (respondent here) petitioned the superior court for relief from regulations promulgated by the prison authorities prohibiting inmates from withdrawing money from inmate prison trust accounts for deposit in regular passbook savings accounts outside the prison.

## FACTS

From 1965 to 1981 San Quentin inmates were allowed to maintain passbook savings accounts at outside banks. In 1978, and with assistance of prison authorities, Parker opened a passbook savings account at First Federal Savings and Loan Association in San Rafael.

On January 1, 1981, San Quentin officials revised Institutional Procedure 206 (I.P. 206) to provide that inmates would not be allowed to withdraw trust account funds for the purpose of establishing passbook or checking accounts, and that all investments by inmates must be long term in nature. (I.P. 206, § VI, subd. (g), subsection (1)(a-b).)[1]

---

[1] I.P. 206 provides for the accounting and control of all personal funds belonging to inmates. The challenged 1981 revision to I.P. 206 provides in pertinent part: "G. Withdrawals to Establish or Maintain Savings Accounts: Inmates may withdraw funds from their trust accounts for investment purposes in accordance with the following guidelines: [¶] 1. Withdrawal to Establish or Maintain Investments: [¶] a. Inmates, either individually or collectively are not permitted to withdraw trust account funds for the purpose of establishing a regular passbook or checking account in a Bank or Savings and Loan Company. Furthermore, trust account withdrawals will not be authorized for deposit in any such account in existence before the inmate's commitment to the department. [¶] b. The investment must be long term in nature, such as for purchase of Government Savings Bonds, Savings Bonds, Savings Accounts in Savings and Loans in the form of Certificate of Deposit not to include regular passbook checking accounts. . . ."

This revision was consistent with California Department of Corrections regulations regarding withdrawals from inmate trust accounts. Those rules provide in pertinent part as follows: "Inmates, either individually or collectively, will not be permitted to withdraw trust account funds for the purpose of establishing a regular passbook or checking account in an outside bank or savings and loan company. Furthermore, trust account withdrawals will not be authorized for deposit in any such accounts in existence before the inmate's commitment to the department." (Business Administration Manual § 4103, subd. (c).) Subdivision (d) of Business Administration Manual § 4103 provides in pertinent part that "[i]nmates may withdraw funds from their trust account for investment purposes in accordance with the following guidelines: [¶] (1) Investment withdrawals must be in increments of not less than $100. [¶] (2) The investment should be long term in nature."

This revision was made in response to a growing problem with the trafficking and use of narcotics and other contraband in the prison.

On February 16, 1982, and on the authority of the 1981 revision to I.P. 206, Parker was denied his request for a trust account withdrawal of $100 to be deposited in his savings account. Parker's administrative appeals of the decision were denied, leading to the instant action.

Appellant prison authorities argued below that prohibition of inmate passbook savings accounts and restriction of inmate investment to those considered to be "long term in nature" is required in order to combat increasing narcotics trafficking within the prison and provide for reasonable institutional security. The court agreed that narcotics trafficking in state prisons is a serious problem which threatens institutional security and that appellants had demonstrated the connection between drug traffic in prisons and the movement of inmate funds. Recognizing that "[a] device is needed to prevent inmates from accomplishing facile transfers of funds without prison supervision . . .," the trial court nevertheless concluded that "[a] rule preventing all but long term investments seems ill-suited for the accomplishment of this objective. This is particularly true when the [warden] has the undoubted authority to prevent suspicious transfers by inmates of outside funds by promulgating regulations placing such funds under close supervision. A regulation or procedure much the same as that now in effect for inmate trust account withdrawals would afford protection against the perceived threat."

It is instructive to briefly review the procedures for control of inmate trust account withdrawals, which the trial court found to be an equally effective but less restrictive alternative to the challenged prohibition.

The Department of Corrections regulations for establishing and maintaining inmate trust accounts, which are authorized by Penal Code section 5008,[2] "provide a system for proper accountability and control of all personal funds belonging to inmates." (Dept. of Corrections Business Admin-

---

[2]Penal Code section 5008 provides in its entirety as follows: "The Director of Corrections shall deposit any funds of inmates in his possession in trust with the Treasurer pursuant to Section 16305.3 of the Government Code, except that the Director of Corrections, when specifically authorized on a separate written form by the inmate and subject to the approval of the Department of Finance, may deposit such funds in interest-bearing bank accounts or invest or reinvest such funds in any of the securities which are described in Article 1 (commencing with Section 16430) of Chapter 3 of Part 2 of Division 4 of Title 2 of the Government Code and for the purposes of deposit or investment only may mingle the funds of any inmate with the funds of other inmates. The director shall deposit the interest or increment accruing on such funds in the Inmate Welfare Fund. Any interest or increment accruing on the funds of a parolee shall be deposited in his or her account."

istration Manual, § 4101.) Consistent with these departmental regulations and institutional directives (Business Administration Manual, §§ 4101-4103; I.P. 206), which are not here challenged, prison officials closely supervise withdrawals from inmate trust accounts.

The procedures required prior to the transfer of funds from an inmate trust account may be summarized as follows: the inmate's counselor must first prepare and initial a "Trust Account Withdrawal Information Report," which includes a determination of the inmate's present and future financial obligations; the identities of businesses, agencies or individuals eligible to receive withdrawn funds; an explanation of the basis for each obligation; and the amount of each debt. The report is simply intended to provide a general reference for staff evaluation and review of individual withdrawal requests. An inmate's trust account withdrawal requests must be submitted by his counselor to the program administrator with a recommendation for approval or disapproval.[3] After review and action by the program administrator, all withdrawal requests are forwarded to the criminal activities coordinator who monitors all trust withdrawal activity in an attempt to insure that funds will not be utilized for improper purposes. Should the criminal activities coordinator detect a suspicious pattern of addresses and inmates or other unusual occurrences he will bring these withdrawals to the attention of the deputy warden for further review and approval. The implementing regulations also impose the following specific restrictions: a) only one trust account withdrawal may be made per month; b) addresses must be verified as current and correct; and c) withdrawals will not be approved if there is any evidence of an illegitimate purpose.

## Discussion

The rights of prisoners in California are governed by Penal Code section 2600 which provides in its entirety: "A person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public."[4]

---

[3] A request to withdraw more than $200 requires certain additional information and the approval of the deputy warden. A request to withdraw more than $600 requires the approval of the warden.

[4] This most recent version of Penal Code section 2600 was enacted in 1975 and is the latest in a long series of statutory provisions gradually recognizing inmates' legal rights. The history of this evolution was summarized by the California Supreme Court in *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865, 870-871 [183 Cal.Rptr. 866, 647 P.2d 142]. (See, also, Krantz, The Law of Corrections and Prisoners Rights (2d ed. 1981) pp. 211-218; and Singer & Statsky, Rights of the Imprisoned (1974) pp. 581-608.)

Penal Code section 2600 is consistent with the ABA Standards for Criminal Justice, Legal

Penal Code section 2601, subdivision (a), guarantees that: "Notwithstanding any other provision of law, each such person shall have the following civil rights: [¶] (a) To inherit, own, sell, or convey real or personal property, including all written or artistic material produced or created by such person during the period of imprisonment; provided that, to the extent authorized in Section 2600, the Department of Corrections may restrict or prohibit sales or conveyances that are made for business purposes."

 The right to own or convey personal property encompasses the right to maintain savings deposit accounts subject only to such restrictions as are reasonably necessary to provide for institutional security and protection of the public. (Pen. Code, § 2600.) We recognize, at the same time, that "[s]ection 2600 cannot be construed as a straitjacket limiting the ability of prison authorities to deal with institutional realities." (*In re Harrell* (1970) 2 Cal.3d 675, 698 [470 P.2d 640].) "Valid and compelling institutional considerations may necessitate certain limited inroads upon the exercise of the prisoner's civil rights." (*In re Van Geldern* (1971) 5 Cal.3d 832, 837 [97 Cal.Rptr. 698, 489 P.2d 578].) Where a showing of necessity is made, reasonable rules and regulations are upheld. (See *In re Cummings* (1980) 30 Cal.3d 870 [180 Cal.Rptr. 826, 640 P.2d 1101]; *In re Price* (1979) 25 Cal.3d 448 [158 Cal.Rptr. 873, 600 P.2d 1330]; *Department of Corrections* v. *Superior Court* (1982) 131 Cal.App.3d 245 [182 Cal.Rptr. 294]; *In re Bell* (1980) 110 Cal.App.3d 818 [168 Cal.Rptr. 100].)

 The only issue on appeal is whether, as a matter of law, the trial court properly reached the conclusion that the challenged regulations impermissibly impaired respondent's civil rights. Appellants' sole contention is that by relying upon the availability of alternatives less restrictive than prohibition of passbook accounts the trial court utilized an improper standard of review. In other words, appellants challenge the legal relevance of the trial court's conclusion that, as set forth in its notice of intended decision, "A regulation or procedure much the same as that now in effect for inmate trust account withdrawals would [if also applied to outside bank deposits] afford protection against the perceived threat." The challenge is entirely without merit.

 This court has recently held that where a restriction is imposed upon an inmate's civil rights protected by Penal Code sections 2600 and

Status of Prisoners (approved draft, 1981), standard 23-1.1: "Prisoners retain the rights of free citizens except: (a) as specifically provided to the contrary in these standards; or (b) when restrictions are necessary to assure their orderly confinement and interaction; or (c) when restrictions are necessary to provide reasonable protection for the rights and physical safety of all members of the prison system and the general public." (See generally, George, *Standards Governing Legal Status of Prisoners* (1981) 59 Denver L.J. 93.)

2601, "the availability of another less restrictive alternative to accomplish the goal of reasonable security weighs against the restriction." (*In re Stone* (1982) 130 Cal.App.3d 922, 927 [182 Cal.Rptr. 79].) *In re Bell, supra,* 110 Cal.App.3d 818, also phrased the test for determining whether administrative restrictions of prisoner's civil rights were "necessary" by reference to a less restrictive means standard. Discussing a limitation on contact visits with prisoners who had been found in possession of contraband, the court stated: "A restriction on the right to personal visits is not necessary if the goal which it is intended to promote can effectively be promoted by less restrictive means. The 'less restrictive means' test employed by the trial court appears to us to reflect accurately the legislative intent. ▉ If there is some less restrictive and equally effective means, other than the procedures challenged here, to promote the goal of preventing smuggling of contraband into San Quentin prison, the challenged procedures are not necessary to the security of the institution and are proscribed by Penal Code section 2601, subdivision (d)." (*Id.,* at p. 822; see also *In re Stone, supra,* 130 Cal.App.3d 922, 927-928; and *In re French* (1980) 106 Cal.App.3d 74, 85-86 [164 Cal.Rptr. 800].)

▉ Although California courts defer to the decisions of prison officials in many contexts, they do not permit prison officials to act arbitrarily or beyond the scope of the officials' statutory authority. (See *Bailey* v. *Loggins* (1982) 32 Cal.3d 907 [187 Cal.Rptr. 575, 654 P.2d 758].) "We recognize that prison administrators are in the best position to control inmates but this control cannot violate statutory or constitutional rights." (*In re Jordan* (1972) 7 Cal.3d 930, 934 [103 Cal.Rptr. 849, 500 P.2d 873].)

▉ Prison administrators are not required to establish procedures which would jeopardize institutional security solely because they provide a lesser restriction on prisoner's rights. "Courts have only required that if the goal of reasonable institutional security can be effectively promoted by several different means, the least restrictive one be chosen. (See, e.g., *In re Harrell, supra,* 2 Cal.3d 675 . . .; *In re Jordan, supra,* 7 Cal.3d 930 . . .; *In re Brandt* (1979) 25 Cal.3d 136 . . . .)" (*In re Stone, supra,* 130 Cal.App.3d 922, 929.)

Appellants rely solely upon two federal cases: *Bell* v. *Wolfish* (1979) 441 U.S. 520 [60 L.Ed.2d 447, 99 S.Ct. 1861] and *United States* v. *Martinez-Fuerte* (1976) 428 U.S. 543 [49 L.Ed.2d 1116, 96 S.Ct. 3074]. These cases simply do not stand for the proposition for which they are cited. The relevance of the latter case is impossible to discern, and the former simply reiterates the familiar principle that a prison administrator is usually entitled to judicial deference because he "ordinarily will . . . have a better grasp of his domain than [a] reviewing judge, [and] also because the operation of

our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." (*Bell* v. *Wolfish, supra,* at p. 548 [60 L.Ed.2d at p. 474].) But the deference to which prison administrators are ordinarily entitled has never been construed as requiring judicial abstention, which is what appellants come close to suggesting. Neither *Bell* v. *Wolfish* nor any other federal or state case prohibits utilization of less restrictive alternative analysis in the evaluation of prison regulations alleged to violate rights protected by sections 2600 and 2601, as is exemplified by our decisions in *In re Stone, supra,* 130 Cal.App.3d 922, and *In re Bell, supra,* 110 Cal.App.3d 818, both of which issued after the decision in *Bell* v. *Wolfish.*

The trial court's determination that prison officials can insure prison security and protect the public by applying less restrictive procedures to control the withdrawal of funds from savings deposit accounts is supported in the record. More specifically, the evidence supports the trial court's factual finding that the unchallenged restrictions on withdrawals from inmate trust accounts (discussed, *ante,* at pp. 586-588) are easily adaptable to passbook savings accounts and that such application of these less onerous restrictions can eliminate the dangers appellants properly wish to avoid as effectively as the outright prohibition of short-term passbook accounts. Further, the evidence fails to demonstrate that the short-term investments or deposits which the challenged restrictions prohibit constitute a materially greater threat to institutional security than permissible long-term investments or deposits, such as savings bonds and certificates of deposit. The inmate investor in such bonds and certificates usually can liquidate his investment and withdraw the funds whenever he wishes, and the loss of interest or other penalty he may suffer for doing so will not likely deter him if his purpose is related to narcotics.

The contention on appeal that application of existing regulations regarding inmate trust funds to outside passbook accounts would place a severe administrative burden on prison authorities was not raised in the trial court. Though such a consideration may be legally relevant (see *In re Cummings, supra,* 30 Cal.3d 870), there is simply no evidence properly before us on the issue.

For the reasons set forth, we conclude that the trial court subjected the restriction in question to the proper standard of review and that its judgment is supported by substantial evidence. In light of the evidence, we additionally believe that the trial judge appraised the facts before him realistically and did not unduly interfere in the discretion that must properly be left to prison officials.[5]

---

[5]In this connection, we note the following statement in the trial court's notice of intended decision: "While there are any number of investments in banks and savings and loan asso-

The judgment is affirmed.

Rouse, J., and Miller, J., concurred.

---

ciations which could be considered other than investments 'long term in nature,' the Court is dealing only with regular passbook savings accounts in banks or savings and loan associations. An inmate should be permitted to establish such an account upon the condition that it will be used only in accordance with the regulations to be promulgated and only upon the inmate's agreement that no movement of funds into or out of the account shall be accomplished without the respondent's written approval in advance. The regulation should establish a means to insure that the inmate complies with this agreement. As a practical matter, prohibitions on transfers to accounts established prior to incarceration is a reasonable measure considering respondent's lack of control over such accounts."

The order of the trial court granting relief also specifically provides that "respondents may promulgate regulations governing the transfer of funds to or from these [regular passbook savings accounts in banks and savings and loan associations], including but not limited to regulations requiring advance written approval of respondents or their designated representatives, before funds may be transferred."