Filed 8/30/16  Safapou v. Doroodian CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CHERIE SAFAPOU,<br><br>　　　　Plaintiff and Appellant,<br><br>v.<br><br>MOSY DOROODIAN,<br><br>　　　　Defendant and Respondent. | A146755<br><br>(Marin County<br>Super Ct. No. FL065330) |

　　　　Plaintiff Cherie Safapou, appearing in propria persona, appeals from a superior court's domestic violence restraining order that bars her from direct or indirect contact with her ex-husband and their teenage son for three years.  Safapou presents a confusing series of grievances against her ex-husband, defendant Mosy Doroodian, the courts and others.  We have no doubt she feels strongly that she has been wronged by the court's order and related matters.  However, her appeal is based on a fundamental misperception of our role. We are not a court of first instance that hears factual contentions anew, nor are we authorized to act based solely on a litigant's sentiments.  Rather, we must presume an order issued in a court below to be correct and determine whether the appellant has met his or her burden of affirmatively showing the order is in error.  Safapou has fallen well short of meeting this burden by not presenting any legally cognizable arguments. Therefore, we must affirm the court's restraining order.

　　　　Safapou also discusses a variety of matters related to her overall dispute with Doroodian, including her concerns with the lower court's 2011 custody and visitation

1

order.  However, as Doroodian (also appearing in propria persona) indicates, Safapou's notice of appeal states only that she is appealing from the court's September 29, 2015 order after hearing, and the domestic violence restraining order is the only one of that date in the record.  " 'The filing of a timely notice of appeal is a jurisdictional prerequisite' " (*People v. Denham* (2014) 222 Cal.App.4th 1210, 1213) and, therefore, we lack jurisdiction to consider Safapou's appellate claims regarding any other orders.  Therefore, we must disregard these claims and do not discuss them further.

## BACKGROUND

Safapou raises numerous matters, but we will discuss only those relevant to the resolution of her appeal from the September 29, 2015 domestic violence restraining order.  On August 25, 2015, Doroodian, appearing in propria persona, requested that the Marin County Superior Court issue a domestic violence restraining order against Safapou for the protection of himself and their teenage son.  In his handwritten request, Doroodian described Safapou's abuse as "calling SFPD to conduct ('well check') continuously, to appear [at] my child school, creating commotion embarrassing the child in front of school counselor, etc. handing out demeaning papers to my son as attached."  He further stated that Safapou "hands out disturbing flyers to my son, encouraging him to disobey the legal matters, encouraging him to call and defy the court order," "continues to call the SFPD to come to my resident for no good reason," and, although she last had a supervised visit with the son in February 2013, "keeps encountering him [at] school."

Doroodian attached to his request what appears to be copies of the front and back of a flyer.  Its first page has a photo of a leopard in the upper left-hand corner, above the words "www.terroristicdivorce.com" and phone numbers for the Department of Justice and Federal Bureau of Investigation.  To the right of the leopard is the heading, "FOLLOW THE MONEY," beneath which are the names of seven judges, two commissioners, an attorney and a court clerk, as well as the Commission on Judicial Performance and its phone number, along with white silhouettes of persons who are otherwise indistinct.

2

On the flyer's second page is the heading "LICENSED CRIMINALS," followed by numerous names, some of which are repeated from the first page. Spread across the middle of the page in bold capitals is the statement "FAMILY COURT IS ORGANIZED CRIME." There is a graphic of a hand manipulating strings around an indistinct figure accompanied by email addresses for "www.terroristicdivorce.com" and two similarly named addresses. On the left-hand side of the page is, as stated, an "excerpt from report by my private investigator," a reference to "Stealth Counter Survillance," and the following statement: "Hello Cherie, [¶] I have done some intermediate research, including Marin County Press and some Court Documents. This will be a very tough nut to crack, as you probably have figured out for yourself. It's a place where everyone are 'good ole boys' and 'you scratch my back, I'll scratch yours'. This type of corruption is not skin deep, my friend. Its a type of extortion by way of everyone knows something about the other, and if one caves and talks, all go down. There is tertiary heresay that infers Organized Crime is involved. It also appears that there 'may' be higher-level politicians complicit." At the bottom of the page, readers are told to contact Governor Brown, whose contact information is listed, to "voice your outrage."

On August 27, 2015, the superior court issued a temporary domestic violence restraining order against Safapou. The court barred Safapou from any direct or indirect contact with Doroodian or the son and scheduled a further hearing on the matter.

On September 15, 2015, Safapou, appearing in propria persona, filed a response opposing Doroodian's request. In a handwritten portion, most but not all of which is legible, Safapou referred to her ex-husband as a "sociopath" whose lies, fraud and interference with her rights had caused her "pain and suffering," and urged the district attorney, "Please don't let my facts get in the way of your ignorance. The facts now irrelevant."

In a typewritten portion of her response, Safapou stated that her ex-husband "lied to me and now is doing it to my poor son, who needs help"; that her ex-husband "added my son's name illegally to his restraining order against me on my son"; that "[m]y Ex has lied on the entire Restraining Order"; that she had "proof in letter form that disputes what

3

he wrote as to why he (and my son) needs protection from me," which she wanted to submit to the court anonymously to protect the letter writer from her ex-husband; that she had never visited her son alone; that as "his mother, it is my right to be in my son's life"; that her son was "suffering emotionally as my Ex said he will make a mess of our son so I can 'clean up the mess' for the rest of my life"; that she was a professional who had "developed violence and suicide prevention programs" and never owned a gun, but that her "Ex said it would cost him only $300 to kill me, that if he could kill us and get away with it he will do it"; that her ex-husband had tried to destroy her professional career and was trying to destroy her son, and had violated her visitation rights with her son after she had participated in seven supervised visitations; that she repeatedly told judicial officers and the district attorney of his violations and they did nothing; that her ex-husband's attorney told her in 2013 that " 'you will see your son in a casket' "; and that since 2011 she had by court order the right to see her son three hours a week and for her ex-husband to pay for these visits, but had seen her son for less than 50 hours.

Safapou further stated in this typewritten portion of her response that "my son needs me more than ever. He has been taken from all of us who love him dearly, knowing he is suffering and we are all suffering with him. My Ex must be charged with child abuse, abuses to me the mother, fraud, putting illegal lien on my residence and making me have to run away from my home. I have no car and no home so he and his family cannot follow me. That is how sociopath's work – inflict fear, make the person suffer, then have them isolate, all because of wanting control and power."

On the second page of her typewritten response, Safapou listed five grievances against her ex-husband. She contended he had changed the son's school four times in violation of a court order so that the son would not make connections or tell anyone about abuses; had pulled her son out of court-ordered therapy; had not paid for her supervised visits with her son or $28,000 in past due child support; and had levied Safapou's mother's bank account.

Safapou attached to her response a variety of documents. These included her own unsigned September 10, 2015 letter to a judge of the superior court expanding on her

4

factual contentions and criticizing the judge; her son's high school report card for two periods showing mediocre grades; two letters, dated January 29 and August 31, 2015, from her son's high school's academic counselor, the latter indicating that Safapou "tells [her son] all the time how much she misses and loves him" while her son "is usually reserved or uncommunicative," and that the son said "he did not like it when [Safapou] sent the police over to his house for a wellness check" or her calling his cell phone; letters from several other high school personnel speaking well of Safapou and her son; a letter from a friend describing Safapou's disappointment at not attending her son's middle school graduation; a letter from a therapist at the Family Service Agency of Marin stating that Safapou "is being treated for PTSD and Anxiety which have worsened over time and seem to be related to the ongoing custody issues regarding her son," "attends treatment regularly" and "seems to benefit from treatment"; a letter from a probation officer indicating that Safapou had successfully completed supervised probation in one case and was in compliance with the remaining conditions "of your active supervised probation case"; and a September 4, 2015 unsigned letter from Safapou to an "Officer Wright" for the County of Marin stating that she had secured a five-year research project and asking for a letter of support. She also indicated that she was working with an attorney on a "RICO action," apparently against judicial officers as she further stated that the attorney "said that if the court does not throw the restraining order out, it will be like shooting themselves in the foot. Let's hope they do their part."

On September 29, 2015, the court held a hearing on Doroodian's request for domestic violence restraining order. Both Doroodian and Safapou appeared, continuing to represent themselves. After they were sworn in, the court heard each of their presentations. Doroodian stated that the son was almost 16 years old, the best 500-meter swimmer in San Francisco high schools, a flutist in an all-city band, and an "A-plus student." Doroodian also gave the court a report card for this son that showed he was receiving very good grades in school.

Doroodian said he dropped his son off at school each morning and respected his son's "territory" there. He held up a document, apparently the flyer that we have

5

described above, and said Safapou "passed this one in the hallway to high school kids, a bunch of kids around." Asked by the court about it further, Doroodian stated that he was told by a school counselor that Safapou "went to his school and gave this to him," meaning their "son in the hallway." He argued that it was "inappropriate . . . to hand this paper to 15 years old boy who's doing so great at school, at music, everything, and embarrassing him in front of his classmates."

Doroodian also told the court there was an order that prohibited Safapou from entering the school and talking to the son, which she could only do during supervised visitations. He said Safapou had yet to visit the son since February 2013, but that she kept sending police to his house, including three times on one night in July. Also, he said, the son had told him Safapou contacted the son at a sandwich shop near his house, and neighbors had said she drove close to his house and had stayed there several times to see if she could encounter the son.

Safapou said that Doroodian was lying. She denied giving out the flyer to anyone at the son's school. She acknowledged going to see the son at his school, as indicated by the academic counselor's August 31, 2015 letter. She denied that the restraining order against her doing so was "real," contending that her ex-husband and his lawyer put the son's name on the restraining order. She also said that she "never had the restraining order" for some period of time, not making clear what period this was, and that when she received a restraining order—perhaps the temporary one issued by the court—she "didn't read it because I was so upset." The court told her that her son was a part of the previous restraining order issued against her, but Safapou disagreed, again insisting that Doroodian put the son's name on it. She referred to it as a "phony restraining order," although the court instructed her that it was not.

Ultimately, Safapou acknowledged an order was in place that required her to see her son only in supervised visitations. She repeated to the court her contentions about Doroodian's refusal to pay for those visitations and her previous efforts to bring his refusal to the attention of judicial officers at the court. She admitted visiting the son at his school, whereupon the court stated, "That's in violation of the order. You don't walk

6

through a restraining order. That is not acceptable." Safapou replied, "Yes, but I couldn't get anywhere." When the court told her she could set up a supervised visitation she appears to have indicated (again, the record is not clear) that visitation supervisors had quit because of her ex-husband's behavior. The court asked her about her own behavior; she praised her own efforts and criticized her ex-husband's conduct in moving her son from school to school. The court told her that her accusations were "horrible" and "shameful," and had been found to be "baseless." When she continued to express concerns about the son, the court responded that he was one of the best swimmers in the city, a fact for which she then took partial credit.

Safapou next contended that she had never visited her son at his school alone. Told such a visit nonetheless would be a violation of the court's order, she said, "I can prove I did not influence my son or I didn't do anything; but the other thing is we are filing the federal suit tomorrow . . . ." She denied having a car or driving by her ex-husband's residence.

The court expressed its concern that the son "shouldn't be disturbed . . . by a parent who has problems because the child needs to . . . feel safe in school," and that he "should definitely not receive a flier distributed to him at the school." Safapou asked the court to review the letter from the academic counselor, and the court pointed out that it stated that the son had asked Safapou to stop calling the police to his house, and to stop calling his cell phone. When mother responded, "because his father punish him," "take away things from him" and "beats him up," the court stated, "You're making horrible, horrible, horrible accusations when you say stuff like that." Further, "the Court has already ruled on that and found that you don't have any credibility when you accuse him." Safapou responded, "Because they didn't read it. They didn't investigate. That's why we are going after them." The court then stated, "I'm going to issue the restraining order as requested." It did so in writing later that day.

Safapou filed a timely appeal from the court's order.

7

## DISCUSSION

Before we review the parties' arguments, we note that both parties appear before this court in propria persona. "When a litigant is appearing in propria persona, he is entitled to the same, but no greater, consideration than other litigants and attorneys [citations]. Further, the in propria persona litigant is held to the same restrictive rules of procedure as an attorney." (*Nelson v. Gaunt* (1981) 125 Cal.App.3d 623, 638–639, followed in *County of Orange v. Smith* (2005) 132 Cal.App.4th 1434, 1444.)

Safapou's opening brief consists of arguments, some of which attempt to relitigate matters unrelated to the court's September 29, 2015 order. We shall not discuss these further. As for the order itself, the record indicates the court made its decision based on its view that Doroodian had provided credible facts about Safapou's violation of a previous, existing restraining order, including that she handed her son an inflammatory flyer at his school in front of classmates; Safapou's admission that she had repeatedly contacted her son at his school in violation of that order; Safapou's repeated denials about the restrictions contained in that order; and her repeated discussion of purported misconduct by her ex-husband that had been previously determined to be unfounded. Further, the court clearly did not find Safapou credible.

Safapou does not challenge any of these aspects of the court's ruling with citation to facts in the record or pertinent legal authority. Instead, she contends without providing factual support that Doroodian "perjured himself"; denies that she engaged in any misconduct; contends her ex-husband's "claims of abuse are *not credible*" in light of his delay in filing for a restraining order; claims that the temporary restraining order should have been "instantly dismissed by the court on its own actions for lack of veracity and merit, to discourage plaintiffs from abusing the justice system and the *Violence Against Women Act (VAWA)*"; contends her ex-husband has for years willfully refused to comply with any order of the court, thereby violating her civil rights and the relationship between her and the son; and argues the court issued the September 29, 2015 restraining order "despite lack of due process, despite the lack of evidence of abuse or violence, despite the

8

*fact* that the Court violated its own custody order by failing to provide a supervisor for the court ordered supervised visits . . . ."

Safapou next contends that the restraining order violates her and the son's constitutional rights to equal protection and due process, but she does not further elaborate in any meaningful way. She contends this restraining order "will cause irreparable damage" to her and the son over the course of the order's three-year duration, and damage her professional reputation, and "will destroy a healthy network of support for Dr. Safapou, and son." She discusses the value of the efforts by her and school staff to help her son, contending that it was "common knowledge" that she "did in fact meet her son at the school routinely to discuss academics and chart a course for a successful tenth (10th) grade for [the son]."

Finally, Safapou reviews a series of counts, apparently from her complaint in the action (which is not contained in the record). She contends there is a substantial likelihood that she will be successful on the merits.

Safapou concludes that the lower courts have colluded with Doroodian to harm her and her son's interests with a "bogus and ill-gotten restraining order." She asserts, "The pathways for protections created for victims by Violence Against Woman Act was not designed to be misused like this to protect the abusive parent, the parent who refuses to comply with any court orders. Yet the lower courts have allowed this." She denies that she has been an unfit parent, insists she has managed to affect the son's life in a positive way even when kept at a legal distance, claims the son has been subjected to years of violence and abuse "of a wide range of physical, and emotional, financial nature," and contends she cannot take continued calls to her from the son because of the restraining order. She seeks not only that we void the restraining order, but also requests that we order eight categories of relief much as a litigant might request of a superior court.

Safapou's arguments ignore fundamental rules of appellate review. An " 'order of the lower court is *presumed correct.* All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Appellant has the

9

burden of affirmatively showing any error. (*Lennane v. Franchise Tax Bd.* (1996) 51 Cal.App.4th 1180, 1189.)

Accordingly, in our review we follow certain guidelines regarding the parties' factual and legal assertions. Regarding factual assertions, we disregard any that are not supported by a citation to the record. " ' "It is the duty of a party to support the arguments in its briefs by appropriate reference to the record, which includes providing exact page citations." ' " (*Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361, 1379.) "Upon the party's failure to do so, the appellate court need not consider or may disregard the matter." (*Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 826, fn. 1; *In re S.C.* (2006) 138 Cal.App.4th 396, 406–407.)

Further, we disregard factual assertions based on information that is not in the record before us. "A reviewing court must accept and is bound by the record before it [citations], cannot properly consider matters not in the record [citations], and will disregard statements of alleged facts in the briefs on appeal which are not contained in the record." (*Weller v. Chavarria* (1965) 233 Cal.App.2d 234, 246, cited in *In re Stone* (1982) 130 Cal.App.3d 922, 930, fn. 9.)

Regarding legal assertions, we treat as waived arguments that are not supported by citation to supporting authorities. " '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

Also, we will not consider legal arguments based solely on conclusory citations. "An appellate court is not required to consider alleged errors where the appellant merely complains of them without pertinent argument" (*Strutt v. Ontario Sav. & Loan Assn.* (1972) 28 Cal.App.3d 866, 873), including when "the relevance of the cited authority is not discussed or points are argued in conclusory form." (See *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979.)

Finally, "[a]ppellate courts 'do not reweigh evidence or reassess the credibility of witnesses. [Citation.]' [Citation.] Put another way, '[t]he Court of Appeal is not a second trier of fact.' " (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531.)

When we apply these rules here, we must affirm the superior court's September 29, 2015 order. Safapou does not meet her burden as appellant of affirmatively showing the superior court erred in issuing this order.

## DISPOSITION

The order appealed from is affirmed. Doroodian is awarded costs of appeal.

_____
STEWART, J.

We concur.

_____
KLINE, P.J.

_____
RICHMAN, J.

11